1

2

3        **IN THE UNITED STATES DISTRICT COURT**

4        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6

7   MATTHEW R. RAMOS,                    )        Case No. 1:03-cv-05790 TAG
                                         )
            Plaintiff,                   )        **FURTHER ORDER ON PETITION**
8                                        )        **FOR ORDER APPROVING**
                                         )        **COMPROMISE IN THE MATTER OF**
9        v.                              )        **MATTHEW R. RAMOS,**
                                         )        **AN INCOMPETENT PERSON**
10  COUNTY OF KERN, et al.,              )
                                         )
            Defendants.                  )
11  _____ )

12

13

14  1.      In this action, plaintiff Matthew Ramos -- represented by Attorney Daniel Rodriguez of

15  the law firm of Rodriguez & Associates -- sought relief arising out of civil rights violations

16  allegedly committed by defendant County of Kern and others.  (Doc. 1).  Subsequent to the filing

17  of a complaint, a motion for the appointment of a guardian ad litem was granted and plaintiff's

18  mother, Mary Ramos, was appointed plaintiff's guardian ad litem on November 20, 2003.  (Docs.

19  8, 15).  Several months later, plaintiff sought to terminate the guardianship, a motion that was

20  denied on April 5, 2004.  (Doc. 27).

21  2.      On April 30, 2004, a petition for order approving compromise of plaintiff's claim was

22  filed.  (Doc. 29).  After a hearing on May 24, 2006, the petition was approved on May 27, 2004.

23  (Docs. 31, 33).  It resulted in the following settlement in favor of plaintiff:

24      a.      A $2,150,000.00 payment by defendant County of Kern in return for a release of
                claims against all defendants.
25
        b.      Of the above amount, the following sums were subtracted, leaving $1,314,515.86
26              for plaintiff:

27              i.      $803,049.62 was paid to Rodriguez & Associates as attorneys fees
                        ($752,500.00) and costs ($50,549.62).
28

1

ii.     $16,289.00 was paid to reimburse medical providers.

iii.    $16,145.52 was paid to Mary Ramos for her expenses in caring for plaintiff as follows: (I) $13,400.00 for nursing care, (ii) $1,145.52 mileage expense and (iii) $1,600.00 retainer fee.

c.    Of the $1,314,515.86 left for plaintiff, $1,047,000.00 was used for the purchase of two separate annuities on behalf of plaintiff:

i.      The first annuity, in the amount of $1,000,000.00, purchased monthly payments of $5,523.48 to plaintiff for life ("the GE annuity").

ii.     The second annuity, the amount of $47,500.00, purchased monthly payments of $259.62 for life ("the First Colony annuity").

d.    After these annuity purchases, $267,015.86 remained on plaintiff's behalf. (Doc 33).

3.    In granting plaintiff's petition for compromise of claim, the Court ordered that the remaining $267,015.86 as set forth above, plus all annuity pay-outs - both accrued payments *and all future payments* - were to be deposited and held in the Rodriguez & Associates' attorney-client trust account pending approval of a petition in the Kern County Superior Court for the appointment of Mary Ramos as conservator of the person and estate of plaintiff Matthew Ramos. (Doc. 33, ¶ 7).  As the Court's Order stated:

> The net sum of $305,680.22, consisting of the remaining $267,515.86 [sic, should be $267,015.86] and the accrued but unpaid annuity payments of $38,664.36 listed in paragraph 2(a) shall be deposited in Rodriguez & Associates' attorney-client trust account for the benefit of Matthew R. Ramos and shall remain there pending further order of this Court.  In addition, all annuity funds paid from the two annuities described in Paragraphs 3 (a) and (b) above after June 2004, shall be deposited in Rodriguez & Associates' attorney-client trust account for the benefit of Matthew R. Ramos and shall remain there pending further order of this Court.  **Said funds ($267,515.86 [sic] and the accrued but unpaid annuity payments of $38,664.36 and all subsequent annuity payments paid after June 2004) may not be withdrawn or transferred from Rodriguez & Associates' attorney-client trust account until (a) a petition to appoint Mary Ramos as conservator of the person <u>and estate</u> of Matthew R. Ramos, currently pending in Kern County Superior Court, is granted, with appropriate orders requiring the posting of a bond or other adequate security, and (b) this Court orders that the funds be transferred**.  Plaintiff may seek leave to transfer the funds via an ex parte application to this Court.  Plaintiff is advised that in the event the conservatorship orders fail to establish a conservatorship of the estate or fail to require adequate security for the funds, this Court will consider requiring the funds to be deposited into federally insured blocked accounts, not to be withdrawn without Court approval.

(Doc 33, ¶ 7) (emphasis added).

///

4.     The above order was based upon the representations of Attorney Rodriguez at the hearing

on the petition for compromise of claim.  At that hearing, Attorney Rodriguez represented that

all funds would remain in his attorney-client trust account and would not be withdrawn without a

prior court order:

> **Court**:  With respect to the remaining balance of $319,475.74, I'm inclined to do
> one of two things.  Either order that they be placed in three separate court blocked
> accounts pending the resolution of the conservatorship petition, whereupon then
> the money can be transferred into the conservatorship account, but that assumes
> that there will be a bond posted for the conservatorship account.  Or I can order
> that the money remain in Mr. Rodriguez's attorney-client trust account until the
> conservatorship petition is granted.  Mr. Rodriguez, any comments on that?
>
> • • •
>
> **Attorney Rodriguez**:  I know that if we place it in a blocked trust account it
> would earn interest.  That interest would be taxable by the way, but nonetheless it
> would be interest earned by Matthew.  If I left it in my trust account, my client-
> trust account, I believe the court, the state bar rules say that in small amounts the
> interest that's earned gets paid to the state or the state bar association.  If it is a
> large sum, it will go to the client.  **So, that being the case, it would be just less
> paperwork if we left it my trust account subject to the same conditions that it
> cannot be withdrawn without court order from this court or, once the state
> conservatorship is set up, then it will be transferred there.  Any interest that
> is earned will be payable back into that settlement.**
>
> **Court**:  Alright.  Then **I will order that the net proceeds, which are estimated
> to be $319,475.74, is to be placed into Mr. Daniel Rodriguez's law firm
> attorney-client for the benefit of Matthew R. Ramos, not to be transferred
> from that account for any reason whatsoever without a further order of this
> court.**  Once the, provided however, that once the conservatorship petition is
> granted, and it requires the proper posting of a bond, then the court will order that
> money be transferred from Mr. Rodriguez's attorney-client trust account into the
> conservatorship bank account.  But you will have to come back into federal court
> to do that.  You can come in on an ex parte basis if you wish to do so, so you
> don't have to do a noticed motion for that.

(Appendix, May 24, 2004 hearing transcript)(emphasis added).

5.     On August 4, 2004, Attorney Rodriguez wrote to the Court advising that a temporary

conservatorship had been established for plaintiff Matthew Ramos and requesting that the Court

authorize the transfer of $317,246.42[1] from the Rodriguez & Associates attorney-client trust

---

[1]  This amount, $317,246.42, precisely equals the original amount placed in the attorney-client trust account
($267,015.86 plus $38,664.36 in accrued annuity payments), plus two additional months of annuity payments that
were received into the Rodriguez & Associates' client-trust account by the time the request to transfer funds was
made.  (Doc. 49, Exh. A).

account to the conservatorship. (Docs. 34, 35).   However, upon observing that the probate court had granted only a temporary guardianship, and had issued only temporary letters of guardianship (both expiring August 24, 2004), the Court issued an order which stated that the requested transfer of funds "may subject the settlement proceeds to a risk of loss in the event the temporary conservatorship and bond expire without the appointment of a permanent conservator and the posting of an adequate bond." (Doc. 35).  Accordingly, the request to transfer $317,246.52 was denied. (Id.)  Subsequent events disclosed that in fact the full $317,246.42 had *already* been distributed by Attorney Rodriguez to Mary Ramos on July 30, 2004.  (Doc. 49, Exh. C).  This fact was not disclosed to the Court until almost two years later and only after the additional series of events set forth below.

6.      Given  the receipt of monthly annuity payments over time, the Rodriguez & Associates' attorney-client trust account should have had approximately $426,818.74 on behalf of Matthew Ramos by March 7, 2006,  the date of a hearing regarding the transfer of such funds to a conservatorship.  (See Doc. 49, Exh. A).  However, at the March 7, 2006 hearing, Attorney Rodriguez represented  that "[a] very small portion . . . was inadvertently released."  (Appendix, March 7, 2006 transcript).  Asked how much, Attorney Rodriguez replied as follows: "$30,000, $40,000, something like that."   Asked what it was used for, Attorney Rodriguez stated that it was for personal things only, since plaintiff Matthew Ramos lived with his parents, and that Mary Ramos "has receipts for all of those things that were spent."  (Appendix, March 7, 2006 transcript).

7.      The Court ordered a follow-up hearing for March 27, 2006, so that counsel could submit an accounting describing, among other things, funds paid out to Mary Ramos.  At that hearing, Attorney Rodriguez again repeated the $30,000 to $40,000 disbursement figure, but failed to produce the accounting that the Court had ordered.  (See Appendix, March 27, 2006 hearing transcript).

8.      Also at the March 27, 2006 hearing, Attorney Rodriguez represented that, as of March 1, 2006, his attorney-client trust account held $427,125.32 on behalf of Matthew Ramos:

4

**Court**: What you told me here, in A, this $427,125.32, that's what's in your trust account as of January, March 1, 2006.

**Attorney Rodriguez**: Right.

**Court**: What I'm, but then you also mentioned at the last hearing that there were other monies that aren't on this list that were paid out and I need to know what those are.

**Attorney Rodriguez**: No. That is the full amount that is in the trust account. That is the full amounts that have been paid to Matthew Ramos. I don't want to say paid to. Paid on his behalf by the insurance company.

**Court**: This money is sitting in your trust account?

**Attorney Rodriguez**: Yes. . . .

(Appendix, March 27, 2006 hearing transcript).

9.      When an accounting of funds disbursed from the Rodriguez & Associates' attorney-client trust account was not produced on either March 7 or March 24, the Court scheduled a third hearing on April 14, 2006. Once again at that hearing, no accounting was produced. However, Attorney Rodriguez divulged after some questioning that in fact $180,000 had been improperly disbursed from his attorney-client trust account. His stated reason for doing so was that he felt sorry for guardian ad litem Mary Ramos and her husband:

**Court**: Alright. How much money was paid to your client from your law firm trust account in violation of this court's order?

**Attorney Rodriguez**: Approximately . . . .

**Mary Ramos**: I have a copy if you want to see it..

**Attorney Rodriguez**: Approximately $180,000.

**Court**: Last time you were here you told me it was 30 or 40.

**Attorney Rodriguez**: Two months ago, when I, I believe roughly two months ago we were trying to get, to find out the number. Since then, we've gotten a much more accurate number. It is something on the order of 180, something like that.

**Court**: Mr. Rodriguez, how did that happen? You were under a court order not to disburse any funds. How did you disburse $180,000?

**Attorney Rodriguez**: Because I let, because I felt sorry for the clients. I was out of town. I released some of the funds because they kept asking me and telling me. The clients being Mrs. Ramos and Mr. Ramos. That they needed this money for their son. And I kept thinking the state court proceeding would be over right away. It wasn't. Then I lost track of that. And then when it was brought back to

5

1
2
3
4
5

my attention I put an end to it, much to the consternation of Mr. and Mrs. Ramos.
I told them that I had done something stupid in being too compassionate and
because it was my fault, I was willing to put in every penny, even though I didn't
profit from it, I was willing to put in every penny that I disbursed in violation of
this court's order because I had done something wrong and I should be held
accountable for it. So I was willing to put in every penny. And, and I still stand
by that. I'm willing to do that. Because I messed up by feeling bad for my clients
and trying to help them out. That was stupid. That was wrong of me to do that.
That's the short answer.

6   (Appendix, April 14, 2006 hearing transcript).

7   10.     As a result of the April 14, 2006 hearing, the Court ordered that federal-court-blocked

8   bank accounts be established no later than April 18, 2006, that all funds in the Rodriguez &

9   Associates' attorney-client trust account pertaining to this matter and all funds released by

10   Attorney Rodriguez to guardian ad litem Mary Ramos be placed into such court-blocked-

11   accounts, and further that a written accounting be filed as to all funds disbursed by Attorney

12   Rodriguez no later than April 28, 2006.  (Doc. 42).

13   11.     As a result of the Court's orders made on April 14, 2006, Attorney Rodriguez did

14   establish federal-court-blocked bank accounts and did file a written accounting.  (Docs. 47, 49).

15   However,  the accounting that was filed indicates that **$392,426.72**, more than double the

16   $180,000 that had been stated to the Court by Attorney Rodriguez just a few days earlier, had

17   been paid out of the Rodriguez & Associates' attorney-client trust account over time.  (Doc. 49,

18   Exh. C.)

19   12.     The accounting filed by Attorney Rodriguez indicates that from May 27, 2004 until July

20   30, 2004, the funds were maintained in the Rodriguez & Associates' attorney-client trust account

21   on behalf of plaintiff Matthew Ramos.  (Id.)  However, the accounting also reflects that on July

22   30, 2004, the entire amount then held in the Rodriguez & Associates' attorney-client trust

23   account on behalf of plaintiff Matthew Ramos – $317,246.42 – was disbursed out of the trust

24   account.

25   13.     As noted above, Attorney Rodriguez wrote to the Court several days after this July 30,

26   2004, disbursement and requested approval to allow the transfer of this precise amount from his

27   attorney-client trust account to a temporary conservatorship.  (Doc. 34).  The Court denied that

28   request, not having been informed that the funds already had been disbursed out of the Rodriguez

1   & Associates' attorney-client trust account and were no longer there.  (Doc. 35).

2   14.    On August 18, 2004, and on or about the 18th day of every month thereafter through

3   August 2005, the entire monthly proceeds of the GE Annuity - $5,523.48 - were paid out by

4   Attorney Rodriguez to Mary Ramos within days of receipt.  (Compare Doc. 49, Exh. A with Doc.

5   49, Exh. C).

6   15.    Likewise, on September 1, 2004, and on or about the first day of every month thereafter

7   through August 2005, the entire monthly proceeds of the First Colony Annuity - $259.62 - were

8   paid out by Attorney Rodriguez to Mary Ramos within days of receipt.  (Compare Doc. 49, Exh.

9   A with Doc. 49, Exh. C).

10  16.    In total, and according to the accounting filed by Attorney Rodriguez, $392,426.72 was

11  disbursed to Mary Ramos from the Rodriguez & Associates' attorney-client trust account,

12  constituting all of the funds initially available and over time received (from the annuities) on

13  plaintiff Matthew Ramos's behalf.[2]  Only after September 1, 2005 were funds fully retained in

14  the Rodriguez & Associates' attorney-client trust account on behalf of Matthew Ramos.

15

16

17        [2]  The Court finds it significant that guardian ad litem Mary Ramos was unable to produce receipts for the
    vast bulk of expenses for which these disbursed funds were used, casting grave doubt upon her competency to serve
18  as guardian and/or conservator.

19        The accounting states that $135,534.89 of the total amount of $392,426.72 that had been disbursed to Mary
    Ramos was re-deposited into a federal-court-blocked-account on April 19, 2006.  (Doc. 49, p. 1).  This would leave
20  $256,891.83 of expenses that would need to be accounted for.

21        Of this  $256,891.83, the accounting includes receipts for only $32,859.98 of expenses. (There is reference
    to an additional $35,000 car loan, but there is no indication in the receipts that $35,000 was actually paid towards an
22  automobile; the records provided show only that a loan was taken out in this amount and that negligible payments
    were made.) (Doc. 49, Exh. D).  Consequently, there are no receipts for almost $224,031.85 of funds disbursed to
23  Mary Ramos but not returned by her to the federal-court-court-blocked-accounts as ordered.  In addition to the few
    receipts provided therein, the accounting also includes what appears to be an estimate of typical monthly expenses.
24  (Doc. 49, Exh. E).  These expenses amount to $3,000 per month and are said to total $61,806.00 from August, 2004
    to the present.  (Id.).  A problem with this estimate is that Matthew Ramos was living with his mother during this
25  time-frame.

26        Also suspect are the uses to which the improperly disbursed funds were put.  Of the very few receipts
    provided in the accounting, almost one-third of the documented expenses - $10,261.33 - were for purchases at a
27  guitar shop.  (Doc. 49, Exh. D).  Similar other expenses, such as over $1,000 at a sports shop, also are reflected.
    (Id.).

28

17.     At a further hearing on the accounting on May 23, 2006, it was disclosed - for the first time - how guardian ad litem Mary Ramos handled the funds ($392,426.72) that had been disbursed to her over time without a Court order.  Although Mary Ramos acknowledged that a state court conservatorship had been established, she testified that she did *not* place all the funds that she received into conservatorship accounts.  Rather, $100,000 of such funds were placed into an account at Kern Schools Federal Credit Union to which Matthew Ramos had equal rights of access.  Likewise, another $100,000 of such funds were placed into an account at Wells Fargo Bank to which Matthew Ramos also had access.  In addition, to giving Matthew Ramos unrestricted access to $200,000, guardian ad litem Mary Ramos also testified that she disbursed an additional $5,000 per month to Matthew Ramos, constituting the bulk of his monthly annuity payments.  (May 23, 2006 hearing transcript).  By way of explanation for her conduct, guardian ad litem Mary Ramos testified that she did not know that she was required to maintain conservatorship funds within conservatorship accounts.  (May 23, 2006 hearing transcript). Further explanation for this conduct, offered by Attorney Rodriguez, was that guardian ad litem Mary Ramos was intimidated by Matthew Ramos, had no ability to control him, and that by giving him unfettered access to money she avoided confrontations that might otherwise arise. Whatever the reasons, the end result is that all but $135,534.89 of the funds that should have been retained in Attorney Rodriguez's attorney-client trust account were spent by Matthew Ramos or were taken as "rent" or "expenses" by guardian ad litem Mary Ramos, with little in the way of receipts.  (See note 2, supra).

18.     The accounting filed on May 3, 2006 by Attorney Rodriguez reflects that, in response to the Court's Order dated April 17, 2006 (Doc. 42),  the law firm of Rodriguez & Associates deposited $438,125.32 into five federal-court-blocked bank accounts on April 18, 2006.  (Doc. 49, p. 1, Exh.B).   This is the full amount of funds that should have been retained in the Rodriguez & Associates' attorney-client trust account through April 2006 had there been full compliance with the Court's Order of May 27, 2004. (Doc. 33).  The accounting also reflects that on April 19, 2006, guardian ad litem Mary Ramos deposited $ 135,534.89 into one of the five federal-court-blocked bank accounts. (Doc. 49, Exh.B). At the last hearing on May 23, 2006,

Attorney Rodriguez represented that the $438, 125.32 deposited by his law firm on April 18, 2006 was his own money, and that the $135,534.89 deposited by Mary Ramos on April 19, 2006 was from money which had been disbursed to her from Matthew R. Ramos's funds. (Appendix, May 23, 2006 hearing transcript).

19.     Based on the foregoing, it appears that the funds on deposit in the federal-court-blocked bank account as of the date of the accounting (Doc. 49 filed on May 3, 2006) total $573,660.21 ($438,125.32 plus $135,534.89), which is approximately $135,534.89 more than what would have been on deposit if there had been full compliance with the Court's Order. Accordingly, the Court surmises that Attorney Rodriguez and/or Rodriguez & Associates have at least attempted to replenish the disbursed funds largely out of their own pockets or from some other unknown sources - and in so doing contributed approximately $135,534.89 more than the amount needed to ensure at least monetary compliance with the Court's order, i.e., to make sure that the amount on deposit by the deadline set by the Court (April 18, 2006) at least equaled what would have been on deposit if there had been full compliance with the Court's Order dated May 27, 2004. (Docs. 33, 42).

20.     Under the above-stated circumstances, and based on the information provided to the Court to date, the Court concludes that Attorney Rodriguez and the law firm of Rodriguez & Associates have now (1) reimbursed plaintiff Matthew R. Ramos for all amounts that were withdrawn from the attorney-client trust account without prior Court approval; and (2) may be entitled to reimbursement in an amount to be determined after a thorough conservatorship accounting has been provided which meets the requirements of the California Probate Code. The Court estimates the amount to be approximately $ 135,534.89; however, in the absence of a conservatorship accounting, the amount is uncertain.  The appropriate forum for a conservatorship accounting which meets the requirements of the California Probate Code, is the Kern County Superior Court, and specifically, the conservatorship case, i.e., In re the Conservatorship of Matthew R. Ramos, Kern County Superior Court Case Number S-1500-PB-53011.

///

9

# ORDERS

The Court makes the following orders:

A.      No later than **August 18, 2006**, all but $135,534.89 of the funds in the federal-court-blocked bank accounts (Doc. 44) shall be transferred directly from the federal-court-blocked bank accounts into federally-insured conservatorship bank accounts established in the name of the conservatorship estate of Matthew R. Ramos, Kern County Superior Court Case Number S-1500-PB-5301. Once such funds have been transferred in accordance with this Order, they shall not be withdrawn without a further order from the Kern County Superior Court. No later than **August 21, 2006**, Guardian ad litem Mary Ramos and Attorney Rodriguez shall file receipts with this Court, showing that such funds have been transferred and deposited in accordance with this Order.

B.      No later than **August 18, 2006**, and once the funds described in Paragraph A above have been transferred as ordered therein, the remaining $135,534.89 of the funds in the federal-court-blocked bank accounts (Doc.44) shall be transferred directly from the federal-court-blocked bank accounts to the Kern County Superior Court and/or to segregated federally-insured Kern County Superior Court-blocked bank accounts in the name of the conservatorship estate of Matthew R. Ramos, Kern County Superior Court Case Number S-1500-PB-5301 (separate from the federally-insured Kern County Superior-Court-blocked bank accounts in Paragraph A above).  Once the $135,534.89 has been transferred in accordance with this Order, such funds shall  be held by the Kern County Superior Court and/or shall remain deposited in the Kern County Superior Court-blocked bank accounts, as the case may be, until (a) a proper conservatorship accounting has been filed in Kern County Superior Court Case Number S-1500-PB-5301 for the period from the initiation of the conservatorship until at least the date of this Order, (b) the conservatorship accounting has been approved by the Kern County Superior Court; and (3) the Kern County Superior Court has determined whether and to what extent such funds should be paid to Attorney  Rodriguez, Rodriguez & Associates, or the conservatorship estate of Matthew R. Ramos. No later than **August 21, 2006**, Guardian

10

1    ad litem Mary Ramos and Attorney Rodriguez shall file with this Court, receipts showing

2    that the $135,534.89 has been transferred and deposited in accordance with this Order.

3    C.       No later than **August 18, 2006**, Guardian ad litem Mary Ramos and Attorney

4    Rodriguez shall (a) file a copy of this Order (along with all the appended court transcripts

5    hereto) with the Kern County Superior Court in Kern County Superior Court Case

6    Number S-1500-PB-5301; and (b) file a proof of service thereof in this action.

7    D.       No later than **August 21, 2006**, Guardian ad Litem Mary Ramos and Attorney

8    Rodriguez shall cause to be filed with this Court, a fully-executed stipulation signed by

9    all necessary parties, for an order dismissing this entire action.

10

11   IT IS SO ORDERED.

12   Dated: August 7, 2006                      /s/ Theresa A. Goldner
                                                Theresa A. Goldner
13                                              United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

**APPENDIX - Court Transcripts**

**1.    May 24, 2004 (redacted)**

**Court**: With respect to the remaining balance of $319,475.74, I'm inclined to do one of two things. Either order that they be placed in three separate court blocked accounts pending the resolution of the conservatorship petition, whereupon then the money can be transferred into the conservatorship account, but that assumes that there will be a bond posted for the conservatorship account. Or I can order that the money remain in Mr. Rodriguez's attorney-client trust account until the conservatorship petition is granted. Mr. Rodriguez, any comments on that?

**Attorney Rodriguez**: May I think out loud your honor?

**Court**: Yes.

**Attorney Rodriguez**: I know that if we place it in a blocked trust account it would earn interest. That interest would be taxable by the way, but nonetheless it would be interest earned by Matthew. If I left it in my trust account, my client-trust account, I believe the court, the state bar rules say that in small amounts the interest that's earned gets paid to the state or the state bar association. If it is a large sum, it will go to the client. So, that being the case, it would be just less paperwork if we left it my trust account subject to the same conditions that it cannot be withdrawn without court order from this court or, once the state conservatorship is set up, then it will be transferred there. Any interest that is earned will be payable back into that settlement.

**Court**: Alright. Then I will order that the net proceeds, which are estimated to be $319,475.74, is to be placed into Mr. Daniel Rodriguez's law firm attorney-client for the benefit of Matthew R. Ramos, not to be transferred from that account for any reason whatsoever without a further order of this court. Once the, provided however, that once the conservatorship petition is granted, and it requires the proper posting of a bond, then the court will order that money be transferred from

Mr. Rodriguez's attorney-client trust account into the conservatorship bank account.  But you will have to come back into federal court to do that.  You can come in on an ex parte basis if you wish to do so, so you don't have to do a noticed motion for that.

**Attorney Rodriguez**:   The further condition I would ask the court to impose is that any interest earned by this money while it is in my firm's client-trust account be payable and transferred once it's transferred to the state . . .

**Court**: So ordered, so long as it doesn't violate the IOLTA rules, interest on law firm trust account rules.  I can't order that you do something that would violate the IOLTA rules.  I also specifically approve the annuity contracts.  I also grant the request that Ms. Ramos be paid $13,400 for the reasonable value of her services in caring for her son during his recovery.  I also approve Ms. Ramos's request to be paid $1,145.52 for mileage for transporting her son to doctor's appointments, and another $1,600 to reimburse her for the retainer fee that she paid to her son's criminal defense attorney in this action.  I also grant the request for $821,832.15 to be paid to Rodriguez & Associates for the attorney's fees, **costs and reasonable expenses as set forth in the petition.  Is there anything else?**

**Attorney Rodriguez**: No, thank you very much for the [?]

**Court**: And would you please prepare the order and submit to my chambers for signature?

**Attorney Rodriguez**: I will your honor.

**Court**: Thank you and good luck Ms. Ramos.

///
///
///
///

**2.**     **March 7, 2006**

**Court**: This is the time set for a hearing based on an order that I made regarding the transfer of funds. I did hear a motion earlier, several, I think it was last year to approve a minor's compromise. And I did make some orders regarding that. And what I wanted to know about is, one, whether there's been a conservatorship established, two, if so, what financial arrangements are made within the conservatorship for the deposit of funds, and is there a court blocked account pursuant to the Kern County Superior Court's conservatorship order and, if so, is there any money in that blocked account, and are there any funds in the law firm's trust account and, if so, where are they. But you can answer them in any order that you want.

**Attorney Rodriguez**: There is a conservatorship that has been established your honor. I believe we have provided the court with the letters, the orders from the probate court of the Kern County Superior Court.

**Court**: I have a copy of the petition for appointment of a conservatorship of the person and the estate. I also have a copy of the letters of conservatorship, and I have a copy of a bond in the amount of $310,000 that was posted, or filed for the conservatorship. How about the blocked account for any funds in excess of $310,000?

**Attorney Rodriguez**: That has not been established for a variety of reasons your honor. Personal circumstance on my part. Personal circumstance on the part of Mrs. Ramos. I do have an accounting for the court. At our law firm, we've had two or three different computer software bookkeeping accounting programs in the last two and half years, and it was a chore, but we got everything, we got every check, every amount, and I apologize to the court again. Personal circumstances maybe I shouldn't go into. The death of my sister last week.

**Court**: Has all of the money that's been paid out pursuant to the settlement, other than attorney's fees and costs that were approved, has all of that money gone into

14

1  the law firm trust account?

2  **Attorney Rodriguez**: It has your honor.

3  **Court**: Has any of that money gone into the conservatorship?

4  **Attorney Rodriguez**: A very small portion that was inadvertently released.

5  **Court**: How much, approximately?

6  **Attorney Rodriguez**: I don't have that information, but we have the total

7  amount.

8  **Court**: How much is the total amount?

9  **Attorney Rodriguez**: The very latest figure is $427,125.32.

10  **Court**: So does that mean that, so far, since the date of my order approving the

11  minor's compromise, that Mr. Ramos hasn't received, actually received any of the

12  money?

13  **Attorney Rodgriguez**: He has received some monies that were inadvertently

14  released to him. But we have the total amount that is due to him.

15  **Court**: Okay.

16  **Attorney Rodriguez**: And it is our intent, because it was my law firm's error in

17  releasing some of that money that we intend to put all of this, regardless of

18  whatever amount was released to him inadvertently.

19  **Court**: What was the amount that was released to him.

20  **Attorney Rodriguez**: I don't have that number.

21  **Court**: Best estimate.

22  **Attorney Rodriguez**: 30, 40, something like that. $30,000, $40,000, something

23  like that.

24  **Court**: What was it used for.

25  **Attorney Rodriguez**: I believe for personal things because he does not receive,

26  he has been living at home with his parents, his parents have supported him since

27  May of 2004 when we last appeared here. Mrs. Ramos has receipts for all of

28  those things that were spent. We intend to bring that to the probate court's

attention.  And we need to establish the blocked trust account.  As I understand it, and I'm not a probate lawyer, but as we understand it any amounts in excess of $310,000 has to be, there has to be a specific court order for that from the probate court.

**Court**: That's what you have in this, in the letters?

**Attorney Rodriguez**: And that's what we intend to do.

**Court**:  Okay.  Before I can approve the transfer of any funds from your trust account to any conservatorship account, I need to know that there is a blocked account that's been established, and I need to have proof of that, because my order, what I anticipate making an order on, is to authorize the transfer of the funds that are in your trust account into the conservatorship account up to the amount of the bonded amount, with any excess deposited into the blocked account.  So I need to have some written proof, usually that's done by way of a letter from the bank where the blocked account is established showing the bank account number.  That needs to be done before I can approve the transfer.

**Attorney Rodriguez**:  Okay.

**Cour**t:  How long will it take to do that?

**Attorney Rodriguez**:  Just to be safe if I said 10 days would that be appropriate?

**Court**:  Well, I just don't know what your schedule is.  That's really up to you and your client.

**Attorney Rodriguez**:  I believe 10 days would be sufficient your honor.

**Court**:  Alright.  That's what I'm looking for.  And, you say you have an accounting at least of the funds that were received?

**Attorney Rodriguez**:  Yes your honor.

**Court**:  Any objection.

**Attorney Nations**:  No your honor.

**Court**:  A is admitted.  Is there anything else that you want me to consider.

**Attorney Rodriguez**:  No your honor.  May I inquire of the court.  If I submit the

16

letter from the bank showing the amounts, would that be sufficient for the court?

**Court**:  If you submit it to me, along with a declaration that the funds that are in Exhibit A are what's in the trust account.  If there's any funds that have been released from the trust account, I need to have some type of an evidentiary accounting for the funds that have been paid out since the date of my order.  Who they were paid out to.  What they were paid for.  How much is in there now.  And to show me that this blocked account has been established.  I need to have something like that in order for me to be at a point where I'm willing to approve the transfer.  Okay?

**Attorney Rodriguez**:  Okay.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

17

**3.**     **March 27, 2006**

**Court**: This is the time set for a follow-up hearing.  When we were last in
session, Mr. Rodriguez, you were going to follow up on the accounting, and you
were also going to bring me proof that a blocked account had been opened.
What's happened?

**Attorney Rodriguez**:  Your honor, Mrs. Ramos, Mary Ramos, the mother of
Matthew Ramos, has asked me to inquire of the court the following, ask for
permission for the court to allow this.  As we understand it, in state probate court
there was a letter of conservatorship that orders that any monies in excess of
$310,000 be placed in a blocked account.  It is our fear, it is Mrs. Ramos's fear
that if all the money goes into the blocked account pursuant to this Court's order,
there would be an unreasonable, a tremendous delay in trying to get these monies.
As we understand it in probate court, any monies that go into a blocked account,
any expenditures from a blocked account, has to, requires court approval.  I will
bring to the court's attention that in this matter, in probate court, it took almost 2
years to get the letters of conservatorship, and the conservatorship set up.   We
were told that the, there were a lot of reasons, but we were told that the primary
reason is that there has been a cutting of the funding to state court that is utilized
for the hiring and retention of investigators for probate court and in this case the
investigator that was appointed to Matthew Ramos's case was told, but was
ordered by the court to go and meet with Mr. Ramos.  That took forever for a
number of reasons.  One, Matthew Ramos is not rational most of the time so he
would not, he missed a couple of appointments with this investigator.  On the
other hand the investigator was, as I understand it I wasn't there present
personally, but I was told that he was chastised by the court because he was told
you're supposed to recognize you're dealing with people who are not necessarily
going to be punctual and so forth, so you have to make a greater effort.  All in all
it took about two years.  In the meantime, Mr. and Mrs. Ramos, the parents of

18

Matthew Ramos, have incurred expenses on their own to support their adult son for this approximate two year period.  For example, if the parents want to go, Mr. and Mrs. Ramos want to go on vacation, have some kind of respite, in order for them to do that they have to pay somebody to be around the house and kind of keep an eye on Matthew.  So, it is Mrs. Ramos's great fear that if this Court orders that all of the money be placed in the blocked account we are going to be back to square zero, it's going to take forever to get monies from probate court allowed for the expenditure for Matthew and that will continue to cause some financial hardship on Mr. and Mrs. Ramos.  So, Mrs. Ramos has asked me to ask the court, respectfully request that the court, if the court would consider depositing half in a blocked account and then we can go to the probate court to undo some of that.  And the other half in a non-blocked account.  Because after all in state court, the state court ordered that only the amount in excess of $310,000 be placed in a blocked account.

**Court**: Has a blocked account been opened?

**Attorney Rodriguez**: No, one has not.  Mrs. Ramos and I talked about it extensively, and we didn't know that if we did that, that it would take longer to undo, at least part of it.  So we thought that the most appropriate course of action would be to come to court, and inquire of this court, and respectfully request that we do half in the blocked trust account and half in the non-blocked account.

**Court**: It was never my intention to put all of the, to order that all of the money be put into the blocked account.  Only if she didn't go and get a conservatorship and have it adequately secured.  I don't know where you or she may have gotten that impression.  My intention was to make an order that's consistent with the probate court order, and that is, any funds in excess of $310,000 be placed into a court blocked account.  But I need to have proof that a court blocked account has been opened so that I can close out this file.  That's why I wanted her to get a court blocked account.

19

**Attorney Rodriguez**: Okay.  May I ask of the court, I just want to make sure we are all on the same wavelength here.  Would it be in keeping with this court's wishes and orders that we place only that amount in excess of $310,00 in a blocked trust account that would be established and the other not in a blocked trust account.

**Court**: It doesn't have to be in a trust account.  It just has to be in a court blocked account blocked by the Kern County Superior Court.  If I issue an order authorizing the funds that are in your trust account right now, pursuant to my previous order in 2004, to be transferred to the conservatorship and to be applied pursuant to the letters of conservatorship, meaning 310 go to the conservatorship, she has to account for that, anything over and above 310 goes into the court blocked account.  In order to get any money out of the court blocked account she'd have to file a petition to withdraw from the court blocked account.  But that's not a difficult thing to do.  That's something that she can do on her own.  She doesn't even need an attorney to do a petition to withdraw from the blocked account.  She just has to show that extraordinary circumstances exist would justify withdrawing those funds from the blocked account.  And an order on that gets made on an ex parte basis, even without a hearing.  It's not that cumbersome to do a petition to withdraw from a blocked account.  But, my intention was not to order her to put it all into a blocked account unless she refuses to comply with my orders to get a conservatorship.  And then, my backup is to order that it all go into a blocked account because then at least I know the money will be accounted for.

**Attorney Rodriguez**: We obviously misunderstood this court's order.  We will endeavor, and I'm sure we can do it, we will place the amount of money that is in my trust account that we have accounted for and put only that amount in excess of the $310,000 in a court-blocked account, and the other in a non-court blocked account.

**Court**: Well you have to have a, has she opened up a conservatorship bank

1   account?

2   **Attorney Rodriguez**:  I believe so but I think, we will verify that.

3   **Court**:  She's bonded for the 310.  So if any money isn't handled appropriately,

4   then that can go against the bond.  But she's also going to have to file an

5   accounting every year in the conservatorship.  I think her first accounting is due

6   January 11, 2007, and she'll have to account for every penny that goes into the

7   conservatorship.  One of the issues that I had last time, and I didn't get the answer

8   to, was how much money has been received since my order in 2004.  And what I

9   heard from you was the money that's on Exhibit A, which is $427,125.32 plus you

10  said there was some other expenses that were paid, it sounded like it was in

11  violation of the court order, so I need to have an accounting for what those are.

12  **Attorney Rodriguez**:  We will provide to the court, hopefully before the next

13  court appearance in this matter, with a full accounting of the entire amount of

14  money depicted in Exhibit A. To the amount of money in both accounts . . . .

15  **Court**:  What you told me here, in A, this $427,125.32, that that's what's in your

16  trust account as of January, March 1, 2006.

17  **Attorney Rodriguez**:  Right.

18  **Court**:  What I'm, but then you also mentioned at the last hearing that there were

19  other monies that aren't on this list that were paid out and I need to know what

20  those are.

21  **Attorney Rodriguez**:  No.  That is the full amount that is in the trust account.

22  That is the full amounts that have been paid to Matthew Ramos.  I don't want to

23  say paid to.  Paid on his behalf by the insurance company.

24  **Court**:  This money is sitting in your trust account?

25  **Attorney Rodriguez**:  Yes.  We will then transfer an amount, whatever amount

26  may be, I'm not going to do the math right now, but whatever the amount is over

27  $310,000 into a court blocked account.  That amount of money less than that will

28  go into a separate conservatorship account that is not blocked.  And I just ask the

1  court . . . .

2  **Court**: But here's my question.  Tell me about the money that was paid out to

3  reimburse the mother and father for expenses.  How much was that.  I need to

4  have some accounting for that.

5  **Attorney Rodriguez**:  [Long silence]  We will provide the court with that.

6  **Court**:  That's what today was all about.

7  **Attorney Rodriguez**: Well, we misunderstood the, the, the court, because we

8  thought we had to put all of it in the blocked, the court blocked account.

9  Obviously that was not this court's order.  I sat here and misunderstood the court

10  when the court said all of it in the blocked trust account.  And then Mrs. Ramos

11  and I talked about it later and we thought, well, maybe we should go back into

12  court and the court for a different . . . .

13  **Court**:  Well, how much money did she receive contrary to the court's order?

14  **Attorney Rodriguez**:  Something on the order of $30,000 to $40,000.  But . . . .

15  **Court**:  And what was it for?

16  **Attorney Rodriguez**:  Different expenditure for Matthew Ramos that included,

17  for example, medication that, I think his medication something on the order of

18  $250 . . .

19  **Mary Ramos**:  $275 a month

20  **Attorney Rodriguez**:  $250 to $300 per month.  He bought a vehicle that he is

21  paying for right now.  He lives at homes and he bought different items, guitar, he

22  lives mostly in his room, a guitar, electronic equipment.

23  **Court**:  Was the money received by your law firm and put in your trust account

24  and you cut a check to her?

25  **Attorney Rodriguez**: Yes, inadvertently.  But, what I'm trying to reassure . . . .

26  **Court**:   Was that money received after the conservatorship was established or

27  before?

28  **Attorney Rodriguez**:  I believe before.  But what I'm trying to reassure the court

22

is whatever amounts that my office inadvertently released we're going to put all of it back in there, regardless. So, this . . . .

**Court**: You're saying you are going to repay the conservatorship for what you already paid out to her?

**Attorney Rodriguez**: Yes.

**Court**: Why?

**Attorney Rodriguez**: Because if I made the mistake I should be accountable and responsible for it. So, I will do that.

**Court**: But the purpose of today's hearing was for you to tell me what that was, so that if it's a legitimate expense, and it was necessary, then you don't have to reimburse anybody for anything. But I need to have an accounting of that.

**Attorney Rodriguez**: Okay.

**Court**: I'm not happy that you transferred funds contrary to the court order and I know I could impose sanctions and I could do all sorts of things, but as long as I have an accounting of what they are and they were legal and legitimate and in his bests interest and they would have otherwise been probably something that as a conservator she could have expensed on his account, or she could have applied to the superior court to get reimbursement for and likely have gotten reimbursed for it, I'm not inclined to order you to pay that back. But that's, I need an explanation for it and an accounting of it. So, how long will it take to get that.

**Attorney Rodriguez**: Let me have 2 weeks your honor. I think we can have everything wrapped up hopefully in two more weeks.

**Court**: Alright, then. What I want is, I want proof that she has established a court blocked account. And all that takes, it doesn't even take 20 minutes to get a court blocked account. You just walk over to whatever bank you are going to, I think at the conservatorship you are actually ordered to put it into a certain bank, I think, let me look at the order. San Joaquin Bank, Main Branch, 17th Street, Bakersfield. You just have to walk over there and order, an open up a blocked

account. That's all you need to do. And I am ordering that all funds in excess of $310,000 be placed into the court blocked account. But I still have to follow up and tie up the last loose string. And that is, I need to have an accounting for any money that was received after the date of my order in, I think it was June of 2004, where I ordered that everything be put into the attorney's trust account. There has to be an accounting for every penny that was received and every penny that went out. That's the way it works.

**Attorney Rodriguez**: We will have that for the court.

**Court**: Okay. And the date of that order was May 27, 2004. Alright?

**Attorney Rodriguez**: Thank you for the court's indulgence.

. . .

**Court**: Now do you understand what I need?

**Attorney Rodriguez**: Yes.

**Court**: I need an accounting for the monies that got paid out contrary to the court's order. I need proof that a blocked account has been opened and that the money has been deposited into it. And you're also going to have to give me an updated accounting on what's been received since I got the other accounting.

**Attorney Rodriguez**: Since Exhibit A?

**Court**: Right. That's what I need.

**Attorney Rodriguez**: We will do that your honor.

///
///
///
///
///
///
///

**4.     April 14, 2006**

**Court**: What has happened since the last hearing?

**Attorney Rodriguez**: Not much. We have, [speaking to Mary Ramos] Do I have your permission to divulge some of the communications you and I have so I can share with the court some of the problems we're having. Do I have that permission?

**Mary Ramos**: Yes.

**Attorney Rodriguez**: As the court is aware, Matthew Ramos is mentally ill. When we left the court, Mrs. Ramos and I here, approximately three weeks ago, we were very clear on what we were supposed to do. One of those things included getting all of the receipts that the court wanted so that we could have a complete accounting for the court. I asked Mrs. Ramos to come to my office that very same afternoon after she got off work so we could start putting the receipts together. She had told me that she had all the receipts, that wouldn't be a problem. I said okay let's get started on this. I think the bottom line was that she was embarrassed to tell me that her son Matthew Ramos who, because of his mental illness is irrational at best, and belligerent and borders on being violent some of the time, he had taken a lot of her receipts and that's why she didn't have them but she was too embarrassed to tell me that she didn't have them. So for the last three weeks I've been calling almost every day trying to set up a time to get these receipts. Today, for the first time, Matthew Ramos showed up with me in a criminal matter in state court. Misdemeanors. Three separate ones. And then, I could tell he was acting a little irrational. And we walked over here. And the reason he is not in the courtroom right now is he's irrational and belligerent. So anyway, for the first time this morning I was handed some receipts which I have. Mrs. Ramos says there's more receipts but she's having a very difficult time convincing Matthew that he should share them with us, because apparently he must have taken them and he has them in his possession. So we have for the first

time some receipts, handed to me five minutes ago.  So, we are working diligently on getting those receipts.  We are not getting the optimum cooperation from Matthew Ramos for obvious reasons.  Namely, he's not rational.  It's very difficult to deal with him.  And I only have to deal with him very infrequently, where Mrs. Ramos has to deal with him every day.  So, did I basically state correctly?

**Mary Ramos**:  Well, I don't think that he's got all the receipts.  I think the main one's I have.  But he's upset because he's not getting an allowance like he was getting before because the money's not coming in.  He wants his money.  That's the bottom line.  He wants his allowance and the money has to start flowing in through that conservatorship . . . .

**Attorney Rodriguez**:  No, but the court.  Anyway, the court has very, the court has told us to get some very specific things.

**Mary Ramos**:  I [?] all the receipts.  You know I've got some more at home.  And I've got Goldner, and didn't tell you, representing me,  She's not here today, Heather's family, but she's got copies of all this stuff.  And I have more receipts at home.  I just want that money to get here.  You know, I have to support him, I have to pay the bills.  So it's time that it starts flowing through.  That's the way I see it.

**Court**:  What do you mean you have Goldner representing you?

**Mary Ramos**:  Yeah.  She's, she couldn't be here today, but she's, Heather's family, we have switched from Mr. Fields because he was not . . . .

**Attorney Rodriguez**:  Mrs. Ramos, may I please?  Mrs. Ramos is being represented in the conservatorship by a member of the Klein Denatale law firm, namely Heather Stanley, in the probate matter that was in state court.  That's what she meant when she said the Klein Goldner law firm.

**Court**:  Has she had to file an accounting in the conservatorship yet?

**Attorney Rodriguez**:  No.

**Court**: That's not due until January 11, 2007, correct?

**Attorney Rodriguez**: I believe so, yes.

**Court**: Alright. How much money was paid to your client from your law firm trust account in violation of this court's order?

**Attorney Rodriguez**: Approximately . . . .

**Mary Ramos**: I have a copy if you want to see it..

**Attorney Rodriguez**: Approximately $180,000.

**Court**: Last time you were here you told me it was 30 or 40.

**Attorney Rodriguez**: Two months ago, when I, I believe roughly two months ago we were trying to get, to find out the number. Since then, we've gotten a much more accurate number. It is something on the order of 180, something like that.

**Court**: Mr. Rodriguez, how did that happen? You were under a court order not to disburse any funds. How did you disburse $180,000?

**Attorney Rodriguez**:  Because I let, because I felt sorry for the clients. I was out of town. I released some of the funds because they kept asking me and telling me. The clients being Mrs. Ramos and Mr. Ramos. That they needed this money for their son. And I kept thinking the state court proceeding would be over right away. It wasn't. Then I lost track of that. And then when it was brought back to my attention I put an end to it, much to the consternation of Mr. and Mrs. Ramos. I told them that I had done something stupid in being too compassionate and because it was my fault, I was willing to put in every penny, even though I didn't profit from it, I was willing to put in every penny that I disbursed in violation of this court's order because I had done something wrong and I should be held accountable for it. So I was willing to put in every penny. And, and I still stand by that. I'm willing to do that. Because I messed up by feeling bad for my clients and trying to help them out. That was stupid. That was wrong of me to do that. That's the short answer.

27

**Court**: To say that I'm shocked would be an understatement. You are going to have to account for every penny that went to her.

**Attorney Rodriguez**: I'm trying to.

**Court**: I need to have a full and complete accounting. When will that be filed?

**Attorney Rodriguez**: Two weeks from now, your honor.

**Court**: Has a court blocked account been opened?

**Attorney Rodriguez**: No.

**Court**: Alright, here's my order today. I want to have a full and complete accounting of all funds disbursed to the client since the inception of the court's order dated May 27, 2004, and it's court document number 33. I am also ordering that all funds be placed into a court blocked account, blocked by this court, not the Kern County Superior Court, but this court. That means that there is to be a court blocked account opened by the close of business today. And all funds are to be . .

**Attorney Rodriguez**: Today's Good Friday your honor, The banks I think will be closed by noon. I have to go back to court.

**Court**: Alright, that is to be placed in a court blocked account by the close of business on Monday, April 17, 2006, with proof of all funds being placed into a court blocked account on file with this court no later than April 18, 2006. And that is a court blocked account to be blocked by this court. That means that there is to be no funds released at all without a prior written order from this court and your client will have to apply to this court to have even one penny taken out of that account. I am also ordering that a full and complete accounting be filed with this court no later than the date which is two weeks from today's date, no later than April 28, 2006, and I will set the matter for hearing on the accounting no later than the following Monday, May 1, 2006, and that will be at 9:30 in the morning in this . . . . it will be on May 6, 2006. It's time to get to the bottom of this.

**Attorney Rodriguez**:  Your honor may I also ask the court to order my clients to transfer all the monies that were transferred to them that are sitting in certain accounts?

**Court**:  So ordered.

**Attorney Rodriguez**:  To be ordered to be placed in this blocked account that the court has just . . . .

**Court**:  How much money is there?

**Attorney Rodriguez**:  It varies.  I get different numbers.  It's something on the order of $100,000 I want to say.

**Court**:  So ordered.  That's to be placed in a court blocked account no later than the close of business on April 17, 2006.  I want every penny of that money that was paid from Mr. Rodriguez and his trust account to be placed into the court blocked account.  Failure to have it on file or failure to have it placed into the court blocked account by Monday will be deemed to be a contempt of this court's order.

**Mary Ramos**:   May I say something your honor?

**Court**:  No.   There is no excuse for what has happened.  There is no excuse for your behavior.  And you will have to account for every penny of it.  And even after the accounting has been filed, I can assure you that it will be gone over with a fine tooth comb.  And if there is any impropriety in any of the payments that have been made, you will be ordered to personally reimburse this account.  Do you understand?

**Mary Ramos**:  Um-hum.

**Court**:  Is that a yes?

**Mary Ramos**:  Yes.

**Court**:  So ordered.  I don't want to hear anything else.  I have given you lot's of time to comply.  I am extremely disappointed at what has happened in this case.  But I'm going to wait to make my final orders on this and give Mr. Rodriguez,

1   and give Mr. Ramos' mother, an opportunity to show me what happened with that

2   money.  But there is no more waiting and there is to be no more excuses.  You

3   must comply with this court's order.  Do you understand?   So ordered.  Court is

4   adjourned.

5   ///

6   ///

7   ///

8   ///

9   ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**5.**    **May 23, 2006**

**Court**: This is the time set for a continued hearing on this matter.  I did receive a copy of the accounting and I am prepared to hear and consider any testimony regarding the accounting.  Do you have any witnesses you wish to call?

**Attorney Rodriguez**:  No your honor.

**Court**: I'd like to hear from Ms. Ramos.  I'd like her to testify under oath regarding the expenses that were paid by her.

**Attorney Rodriguez**: Your honor, with the court's permission, another check came in that we deposited, and I have a copy of the receipt.

**Court**: Alright would you hand that to the courtroom deputy.  That will be marked as exhibit first in order.

**Attorney Rodriguez**: And with the court's permission I'd like to advise the court that that amount was placed in the account that is the smallest of the accounts.  There's I believe four of them that are $100,000 a piece and then there is one that is less than $100,000, and that amount was placed in that account.  And that represents the latest annuity check that came in and was deposited in that account.

**Court**: What's the amount of that last payment?

**Attorney Rodriguez**: It is $5,783.80.

**Court**: Thank you.  And what I'd like you to track for me through Ms. Ramos's testimony, Mr. Rodriguez, is the history of what happened to this money.  Ms. Ramos, would you please step forward to the witness stand, it's over to my right.  When you get there please raise your right hand and be sworn.  Do you solemnly swear that the testimony you shall give in the matter now pending before the court shall be the truth, the whole truth, and nothing but the truth, so help you god?'

**Mary Ramos**: Yes.

**Court**: Thank you.  Please have a seat, state your name, and spell your first and last name for the record.

**Mary Ramos**: My name is Mary Ramos, M-A-R-Y  R-A-M-O-S.

31

**Court**: Thank you, please proceed.  He's going to be asking you questions.

**Attorney Rodriguez**: Mrs. Ramos, where do you live at please?

**Mary Ramos**: 3109 St. Thomas Way, Bakersfield.

**Attorney Rodriguez**: Who lives there with you?

**Mary Ramos**: Matthew Ramos, and John Ramos, my husband.

**Attorney Rodriguez**: And Matthew Ramos, how old is he?

**Mary Ramos**: He's 29.

**Attorney Rodriguez**: And you are the conservator of Matthew Ramos?

**Mary Ramos**: Yes.

**Attorney Rodriguez**: Back in August of 2004, there was monies that were released to you from the settlement of Matthew Ramos by my office, is that correct?

**Mary Ramos**:  Correct.

**Attorney Rodriguez**: And that amount was approximately $317,246.42?

**Mary Ramos**: That's correct.

**Court**: Did you say August or July?

**Attorney Rodriguez**:  I said August your honor, but I stand corrected, I'm looking at Exhibit C now, and it shows the date to be July 30, 2004.

**Court**: Alright, would you like to rephrase your question?

**Attorney Rodriguez**: Yes.  On July 30, 2004 was the amount of $317,246.42 released to you by my office?

**Mary Ramos**: Yes.

**Attorney Rodriguez**: And thereafter, there was an approximate amount of $5,783.80 made up of two checks that were released to you on a monthly basis which represented annuity payments to Matthew Ramos?

**Mary Ramos**: Yes, there were.

**Attorney Rodriguez**: And you continued to receive those monthly amounts up until about September, 2005?

**Mary Ramos**: No, it was August of '05.

**Attorney Rodriguez**:  Those amounts of money, were they placed in any kinds of accounts?

**Mary Ramos**: Yes, there were in a bank account with my name on it.

**Attorney Rodriguez**: Was there more than one account that these monies were placed in?

**Mary Ramos**: Yes because the commissioner in state court did agree with me that they should be distributed in different accounts because of their security.

**Attorney Rodriguez**: And do you remember approximately how many such accounts were established?

**Mary Ramos**: Three.

**Attorney Rodriguez**: And do you remember at what institutions they were at?

**Mary Ramos**: Kern Schools, Bank of America and Wells Fargo.

**Attorney Rodriguez**: And during this time, during this entire time from about May of 2004 up until the present date, has Matthew Ramos lived with you at your residence that you just gave us?

**Mary Ramos**: Yes.

**Attorney Rodriguez**: And, have you provided food, room and board and that type of thing to him?

**Mary Ramos**: Yes.

**Attorney Rodriguez**: During this time, from about July of 2004 to the present date, has Matthew Ramos spent certain amount of monies for himself?

**Mary Ramos**: Yes.

**Attorney Rodriguez**: Has all the money that was released to you, was all of that expended?  Was it all spent by Matthew Ramos?

**Mary Ramos**: Yes.

**Attorney Rodriguez**: Now, and I'd like for you to listen to the question.  Has all the money been spent by him, or were there still money in some of the accounts?

**Mary Ramos**: There was still money in some account which I did deposit.  And the other

was spent for Matthew's expenditures.

**Attorney Rodriguez**: What kinds of things did Matthew, what kinds of things did Matthew spend money on?

**Mary Ramos**: Musical instruments, which he was playing when he was a little boy.  He also got some gym equipment.  And every now and then videos and entertainment. Eating out.

**Attorney Rodriguez**: Did he buy a car?

**Mary Ramos**: Oh yeah, he bought a car also.

**Attorney Rodriguez**: The receipts that were attached as Exhibit D, were those receipts that you kept?

**Mary Ramos**: Yes.

**Attorney Rodriguez**: Now were those all receipts that you kept yourself?  Or that Matthew Ramos kept?  Or a combination of both?

**Mary Ramos**: Well, he kept the receipts that he bought the musical instruments with and some of the other expenditures, but I have access to them.

**Attorney Rodriguez**: Were there some expenses that were made by Matthew Ramos, or for Matthew Ramos, that there are no receipts for?

**Mary Ramos**:  Yes.

**Attorney Rodriguez**:   For example, things like food?  Did he go out and eat?

**Mary Ramos**: Yeah, and he would go out and eat also at restaurants and stuff.  And I did see it on the bank account sometimes when he used the card.  But yeah I do have receipts for those.

**Attorney Rodriguez**:   And did he use money for gas to get around town?

**Mary Ramos**:  Yes.

**Attorney Rodriguez**:  Did he have health insurance during the time that he's lived at home with you all this time?

**Mary Ramos**: Yes until it went off for a while, and then I looked into getting Blue Cross for him and I didn't have the money anymore.

34

**Attorney Rodriguez**: Okay.  Things such as telephone, the internet, those kinds of things, did Matthew spend money on those things for which there are no receipts?

**Mary Ramos**:   Yes.

**Attorney Rodriguez**: As an example, why would there not be any receipts for example on expenses for internet?

**Mary Ramos**: I think those I do have.  I have to dig them up.  I'm sure I have those they are [unintelligible] Lighthouse receipts.

**Attorney Rodriguez**:   Can you share with us, is it difficult or easy to get those receipts that you think you might have?

**Mary Ramos**:   Some of them are difficult because he'll order movies and then we see that later, we might see it on the bill, maybe not.  And maybe I don't see that particular bill.  I'm sure they all come there.

**Attorney Rodriguez**:   For example, does he play golf?

**Mary Ramos**:   Yeah.

**Attorney Rodriguez**:   If he plays golf, does he belong, does he have a membership or does he have to pay every time he goes?

**Mary Ramos**:   He pays every time he goes.

**Attorney Rodriguez**: Does he always turn over the receipts to you?

**Mary Ramos**:   No.

**Attorney Rodriguez**:   If he, for entertainment for example, if he goes out to the movies does he bring any receipts back to you?

**Mary Ramos**: No.

**Attorney Rodriguez**:   Let me ask you a little bit about your ability to control Matthew. Do you have the ability to control Matthew?

**Mary Ramos**:   Well he wants to be independent.  He wants to do a lot of things without having to [unintelligible] mommy [unintelligible].

**Attorney Rodriguez**:   Now, does he like the idea that you look over his shoulder, or does he resent having you look over his shoulder?

**Mary Ramos**:  I think at times he's glad I'm there, but a lot of times he does resent that.

**Attorney Rodriguez**:   Does Matthew have a brain disorder known as bipolar schizophrenia?

**Mary Ramos**:  Yes.

**Attorney Rodriguez**: Does he take medication for that condition?

**Mary Ramos**:  I have to more or less follow him around and give him that.

**Attorney Rodriguez**:  Is he prescribed medication to take?

**Mary Ramos**:  Yes.

**Attorney Rodriguez**:  Does he always take it on his own?

**Mary Ramos**:  No.

**Attorney Rodriguez**:  Are there sometimes that as a mother you have to give him the medication without him knowing it?

**Mary Ramos**:  Yes.

**Attorney Rodriguez**:  If he does not take the medication, does his behavior change at all?

**Mary Ramos**:  Oh yeah, there's a change if he doesn't take it.

**Attorney Rodriguez**:  If he does not take his medication, would you say he's rational or irrational, does he become rational or irrational?

**Mary Ramos**:  Irrational if he doesn't take it.

**Attorney Rodriguez**: In the times that he's been there at the house since August, July of 2004 or so, have there been episodes of confrontation between Matthew and yourself or Matthew and his father?

**Mary Ramos**: Probably his dad.

**Attorney Rodriguez**: If Matthew wants to spend money on a particular item, and you say no, and he has not been taking his medication, what is his reaction generally?

**Mary Ramos**: He probably wouldn't be very rational, but I don't think he spends his money foolishly.

**Attorney Rodriguez**: Okay.  On April 19th, you deposited approximately $135,534.89 in

36

a blocked account at San Joaquin Bank?

**Mary Ramos**: I did.

**Attorney Rodriguez**: Where did you get that money?  Where did that money come from?

**Mary Ramos**: It came from the bank institutions that I had deposited that money to, like Wells Fargo, Bank of America and Kern Schools.

**Attorney Rodriguez**: Did Matthew have access to those accounts that you previously told about at Kern Federal Credit School Union, the institutions you told us about?

**Mary Ramos**:   Yeah, he did.  I wasn't instructed to do otherwise so yeah, he did.  It was under my name and his.

**Court**: Were those accounts that were established for the conservatorship under the state court order?

**Mary Ramos**: I think those were taken and deposited in these different accounts, yes.

**Court**: My question is, were those three accounts created as a part of the, to comply with the state court's order establishing a conservatorship?

**Mary Ramos**: Oh well they were deposited Bank of San Joaquin which is the conservatorship's account, but nobody told me that I couldn't disburse them into different banks.  I wasn't told that.

**Court**: Were they put into a conservatorship account in the name of the conservatorship?

**Mary Ramos**: The one at Bank of America.

**Court**: What about Kern Schools?

**Mary Ramos**: No.

**Court**: Or Wells Fargo?

**Mary Ramos**: No.

**Court**: Why weren't all three of them established as conservatorship accounts?

**Mary Ramos**: I guess I didn't know I was supposed to do that.

**Court**: And who had the ability to control the money in the Wells Fargo account?

**Mary Ramos**: I did.

**Court**: Did Matthew?

1    **Mary Ramos**: He did too, but he never spend that.

2    **Court**: Who had the ability to write checks on that account?

3    **Mary Ramos**: I did.

4    **Court:** Did Matthew?

5    **Mary Ramos**: But I had the checks that were given to me.

6    **Court**:   Answer my question.  Did Matthew have the authority?

7    **Mary Ramos**: Yeah, he probably did, his name was on the account.

8    **Court**: Alright.  And the Kern Schools Federal Credit Union account, was that

9    established as a conservatorship account?

10   **Mary Ramos**: His name was on there.

11   **Court**: Was it established as a conservatorship account?

12   **Mary Ramos**: No, no.

13   **Court**: Did he have the ability take money out of that account?

14   **Mary Ramos**: Yes.

15   **Court**: And the Bank of America account.  Was that established as a conservatorship

16   account?

17   **Mary Ramos**: Yes.

18   **Court:** And who had the authority to withdraw money from that.

19   **Mary Ramos**: I did.

20   **Court**: Did Matthew?

21   **Mary Ramos**: Not in this account, no.

22   **Court**: What was the name on the Bank of America account?

23   **Mary Ramos**: I have a check, it says on there the conservatorship of Matthew Ramos and

24   it states my name also.

25   **Court**: Did you only create one conservatorship account then?

26   **Mary Ramos**: Um-hum, and the one that was at San Joaquin.

27   **Court**: I'm confused.

28   **Mary Ramos**: There was two.  There was one at San Joaquin and there was the Bank of

1   America one, that I paid the bills from.

2   **Court**: The San Joaquin account, how was that account titled?

3   **Mary Ramos**: That was also the conservatorship of Matthew Ramos.

4   **Court**: And who had the authority to withdraw funds from that account?

5   **Mary Ramos**: I did.

6   **Court**: Did Matthew?

7   **Mary Ramos**: No.

8   **Court**: Okay, the Bank of America account.  How was that account titled?

9   **Mary Ramos**: That was also the conservatorship of Matthew Ramos.

10  **Court**: And who had authority to withdraw funds from that account?

11  **Mary Ramos**: I did.

12  **Court**: Did Matthew?

13  **Mary Ramos**: No.

14  **Court**: And then the Kern Schools Federal Credit Union account, how was that account

15  titled?

16  **Mary Ramos**: That was his name and mine on the account.

17  **Court**: Was that established as a conservatorship account?

18  **Mary Ramos**: No, no.

19  **Court**: And did he have the authority to withdraw funds?

20  **Mary Ramos**: Yes, yes.

21  **Court**: How much money did you put into the San Joaquin account?

22  **Mary Ramos**: The checks that came from Mr. Rodriguez's office.

23  **Court**: How much was that?

24  **Mary Ramos**: It was $300, over $300,000.

25  **Court**: How much money was put into the BofA account?

26  **Mary Ramos**: $100,000.

27  **Court**: How much money was put into the Kern Schools Federal Credit Union account?

28  **Mary Ramos**: $100,000.

1    **Court**: Alright, go ahead.

2    **Attorney Rodriguez**: Did Matthew spend any of the money, that you know of, on things

3    such as drugs, street drugs, illegal drugs, that kind of thing?

4    **Mary Ramos**:  No.

5    **Attorney Rodriguez**: Was all the money that you're aware of that Matthew spent, for

6    which there are no receipts, was it all for his entertainment, his health, his welfare?

7    **Mary Ramos**: I think at the time a lot of it was spent when he went to east coast, we

8    stayed there a whole weekend, and I do have the receipts for that somewhere, where he

9    got his separate room.  He gave his brother a wedding gift, which was probably $500.

10    And he bought his own ticket to get there, to and from.

11    **Attorney Rodriguez**:   My question is, do you know of any expenditures made by

12    Matthew that were for things such as drugs, or anything that you would consider to be not

13    correctly spent?

14    **Mary Ramos**: No, no.

15    **Attorney Rodriguez**: As far as you know, all the monies that were spent by Matthew for

16    which he has no receipts were for his health, his entertainment, his welfare?

17    **Mary Ramos**: Right, correct.

18    **Attorney Rodriguez**: Did you spend any of the money yourself, for any reason?

19    **Mary Ramos**: No.

20    **Attorney Rodriguez**: And when I say yourself, I meant for your benefit and not for

21    Matthew's benefit?

22    **Mary Ramos**: No, I don't think I need to spend his money.  I work, I have my own

23    money, I worked for years, I have a deferred comp which I'm now able to dig into that, so

24    I really don't have, and he's my son and I protect his interest.

25    **Attorney Rodriguez**: Your husband, his name is what?

26    **Mary Ramos**: John Ramos.

27    **Attorney Rodriguez**: And, by the way, let me back up a little bit.  How old are you Mrs.

28    Ramos?

1   **Mary Ramos**:  I'm 61.

2   **Attorney Rodriguez**: And you are employed by whom?

3   **Mary Ramos**:  Kern County Department of Public Health.

4   **Attorney Rodriguez**: And your husband, Mr. Ramos, how old is he?

5   **Mary Ramos**: He's 60.

6   **Attorney Rodriguez**: Does he work?

7   **Mary Ramos**:   He's now retired from planning, Kern County.

8   **Attorney Rodriguez**: The planning department with the County of Kern?

9   **Mary Ramos**: Um-hum.

10  **Attorney Rodriguez**: And when did he retire?

11  **Mary Ramos**:   In March of this year.

12  **Attorney Rodriguez**: Were any of the monies of Matthew spent for the benefit of your

13  husband, Mr. Ramos?

14  **Mary Ramos**: No, he also has deferred comp, and he's retired and he got his own money.

15  **Attorney Rodriguez**: Was any of the monies spent by Matthew Ramos, I'm sorry, spent

16  by you, where you wrote out the checks, were any of that, was any of that money spent for

17  anyone's benefit other than Matthew Ramos?

18  **Mary Ramos**: No, just for Matthew.

19  **Attorney Rodriguez**: Okay.  Thank you.  I have no further questions.

20  **Court**: Where do you live now?

21  **Mary Ramos**: 3109 St. Thomas Way.

22  **Court**: Is that in Bakersfield?

23  **Mary Ramos**: Bakersfield, 06.

24  **Court**: How long have you lived there?

25  **Mary Ramos**: 11 years.

26  **Court**: How long has Matthew lived with you there?

27  **Mary Ramos**: 11 years.

28  **Court**: Do you charge him rent?

41

**Mary Ramos**: Yes, which he hasn't paid for the last 8 months because he doesn't have an income.

**Court**: How much money do you charge him for rent?

**Mary Ramos**: $700 for all I do for him, and his room.

**Court**: What do you do for him?

**Mary Ramos**: For one thing, I used my vacation up on him, like this last time running around to the bank and, his doctor, I always accompany him to his doctor appointments, I pick up his medication at the pharmacy.

**Court**: Are you charging him an hourly rate?

**Mary Ramos**: No, I'm only charging him the $700/month for his room and for eating there whenever he does.

**Court**: Is that supposed to be your conservatorship fees?

**Mary Ramos**: I was never told, other than I said I would charge him $700 for living there.  I have in the past charged him for ordering the movies that he does.

**Court**: When did you start charging him $700/month.

**Mary Ramos**: From the very beginning.

**Court**: When was that?

**Mary Ramos**: 2004.

**Court**: What month?

**Mary Ramos**: As soon as he got his money.

**Court**: Was that in July?

**Mary Ramos**: That was in July.

**Court**: When the money was paid to you, I think you told Mr. Rodgriguez that you were paid $317,000 . . .

**Mary Ramos**: It's in the packet, it says . . .

**Court**: I have some questions I'd like to ask, please don't interrupt.

**Mary Ramos**: Okay.

**Court**: When the money was paid to you in July of 2004, what is the first thing that you

42

1    did with it?

2    **Mary Ramos**: It was deposited at San Joaquin.

3    **Court**: In what amounts?  Did you put the whole thing into San Joaquin?

4    **Mary Ramos**: Um-hum, I did.

5    **Court**: And what did you do next with the money?

6    **Mary Ramos**: Oh, and then we disbursed it to the different banks.

7    **Court**: Meaning which banks?

8    **Mary Ramos**: Bank of America, Wells Fargo and Kern Schools.

9    **Court**: How much did you put into Wells Fargo?

10   **Mary Ramos**: $100,000.

11   **Court**: And how much did you put into Kern Schools?

12   **Mary Ramos**: Kern Schools, $100,000.

13   **Court**: And how much did you put into Bank of America?

14   **Mary Ramos**: $100,000.

15   **Court**: So you still had some money left over in San Joaquin?

16   **Mary Ramos**: Right, correct.

17   **Court**: How much did you have left over?

18   **Mary Ramos**: Well, I don't remember how much was left over from the initial amount

19   that was given me to deposit there at San Joaquin.  In fact at that time Mr. Fields opened,

20   helped me open the bank account there at San Joaquin.  I think shortly after that for a few

21   months I got the $5,000, they were also deposited there.  And I have copies of the checks.

22   **Court**: If you were paid $317,246.42 from Mr. Rodriguez on July 30, 2004, and you

23   disbursed $300,000 of it to the BofA account, the Kern Schools account and the Wells

24   Fargo account, wouldn't you have approximately $17,246.42 left?

25   **Mary Ramos**: I don't have it before me, I don't know the exact amounts, but I know that

26   it was left there at San Joaquin.

27   **Court**: And what was that money spent on?

28   **Mary Ramos**: To buy a car, he bought a car with that.

43

1  **Court**: What kind of car did he buy?

2  **Mary Ramos**: He bought a Pontiac.

3  **Court**: Now I'm talking about the $17,000 that was left over, was that used to buy the

4  car?

5  **Mary Ramos**: Oh no.  That was used to pay his bills, like his medication, his doctor bills.

6  I wrote a check out of that account.

7  **Court**: And what else did you put into that account, and I'm talking about the original

8  San Joaquin account.

9  **Mary Ramos**: The original San Joaquin, I would deposit the checks there.

10  **Court**: The monthly checks?

11  **Mary Ramos**: Um-hum, and then of course I would give him the allowance to deposit at

12  Kern Schools.

13  **Court**: Now, you told me that there were three other accounts that had $100,000 in each

14  of them, BofA, Kern Schools and Wells Fargo.

15  **Mary Ramos**: Right.

16  **Court**: Was the Wells Fargo account opened up as a conservatorship account?

17  **Mary Ramos**: Not the Wells Fargo.

18  **Court**: Whose name was on that account.

19  **Mary Ramos**: Mine and Matt.

20  **Court**: So, did Matthew and you both have the right to take money out of that account?

21  **Mary Ramos**: Yes.

22  **Court**: How much did he have direct access to, the way you set up the bank accounts?

23  **Mary Ramos**: It was just deposited in my name and his, so he obviously had direct, you

24  know.

25  **Court**: So he had direct access to the money in the Wells Fargo account?

26  **Mary Ramos**: Right.

27  **Court**: And he had direct access to the money in the Kern Schools account?

28  **Mary Ramos**: Right.

**Court**: Did he have direct access to the money in the BofA account?

**Mary Ramos**: Some of it was put in a different account, and some was the conservatorship which he didn't.

**Court**: Of the $100,000 that you put into the BofA account, did you disburse money from that account?

**Mary Ramos**: Only to the conservatorship account, which was like $2,000.

**Court**: So, there would have been around $98,000 left in that account?

**Mary Ramos**: Right.

**Court**: And when you say the conservatorship account, which one are you talking about?

**Mary Ramos**: Bank of America.

**Court**: Now, the Kern Schools Federal Credit Union Account, earlier you told me that you put in $100,000 in that account?

**Mary Ramos**: Wells Fargo, yes.

**Court**: I'm talking about Kern Schools Federal Credit Union.

**Mary Ramos**: Yes.

**Court**: Did you put $100,000 in that account?

**Mary Ramos**: Yes.

**Court**: And Matthew had direct access to that, is that right?

**Mary Ramos**: Right.

**Court**: And the Wells Fargo account, you told me earlier that you put $100,000 in that account, correct?

**Mary Ramos**: Right.

**Court**: And Matthew had direct access to that as well?

**Mary Ramos**: Right.

**Court**: Does that mean that Matthew had direct access to $200,000?

**Mary Ramos**: He did.

**Court**: What else did he have direct access to, if anything?

**Mary Ramos**: None that I can think of.  I know he didn't at the San Joaquin account.

45

1  **Court**: Of the $200,000 that he was given direct access to, how much did he spend?

2  **Mary Ramos**: Well, he bought a car, I know that.  That was $3,500.  And, I'm going to

3  say $100,000.

4  **Court**: Do you know what he spent it on?

5  **Mary Ramos**: Yes.

6  **Court**: What?

7  **Mary Ramos**: The car, the instruments, the gym, gym equipment, his everyday

8  expenditures.

9  **Court**: Now, did all of this money get spent while the conservatorship was in effect?

10  **Mary Ramos**: Yes.

11  **Court**: Did you sign anything at the superior court acknowledging that you understood

12  what your duties as a conservator were?

13  **Mary Ramos**: I don't remember signing that, no.

14  **Court**: What do you believe your duties as a conservator are supposed to be?

15  **Mary Ramos**: Pay his bills and help him out.

16  **Court**: Do you believe that you are responsible for fiscally managing his resources?

17  **Mary Ramos**: Yeah, I think he lives in my house, I think I do that pretty much.

18  **Court**: But you let him spend the money as he wished, it that correct?

19  **Mary Ramos**: Well, I gave him an allowance.  I went into Kern Schools that he was

20  spending.

21  **Court**: How much of an allowance did you give him from Kern Schools?

22  **Mary Ramos**: Well there was already that money, and I used to give him $5,000 a

23  month.

24  **Court**: So he had direct access to $200,000, plus you gave him another $5,000 every

25  month?

26  **Mary Ramos**: Um-hum, I put in that account, yes.

27  **Court**: Why did you give him direct access to $200,000?

28  **Mary Ramos**: I don't know.  I guess I wasn't told I wasn't supposed to do that.  I know

1   that I had gotten permission to disburse the amounts for security purpose.

2   **Court**: Do you have any other questions, Mr. Rodgriguez?

3   **Attorney Rodriguez**: No your honor?

4   **Court**: Mr. Rodgriguez, I have some questions that I would like to ask you, but I'm not

5   going to put you under oath.  My first question of you is, in looking at the paperwork, it

6   appears to me that the money was disbursed to your client, Ms. Ramos, on July 30, 2004.

7   All the money that was left over, the $317,246.42.  Do you agree with that?

8   **Attorney Rodriguez**: Yes your honor.  Your honor, the court may place me under oath, I

9   have no problems with the court placing me under oath.

10  **Court**: I'm not going to put you under oath.

11  **Attorney Rodriguez**: Okay.

12  **Court**: Are we on the same book and page on that?

13  **Attorney Rodriguez**: Your honor, what exhibit is the court looking at?

14  **Court**: Looking at, I think it's exhibit C.

15  **Attorney Rodriguez**: I apologize.  May I have the question again your honor.

16  **Court**: Did your law firm, did you and your law firm transfer $317,246.42 to Ms. Ramos

17  on July 30, 2004?

18  **Attorney Rodriguez**: Yes your honor.

19  **Court**: Now, do you agree that that money was transferred after I made my order telling

20  you that you had to keep all the money in your attorney-client trust account?

21  **Attorney Rodriguez**: Yes your honor.

22  **Court**: My first question is, why did you transfer the money when there was an existing

23  court order saying that it was to stay in your attorney-client trust account?

24  **Attorney Rodriguez**: The clients were in dire straights.  Matthew Ramos, as I previously

25  mentioned in the questioning of Mrs. Ramos, has been diagnosed as bipolar

26  schizophrenic.  There are basically two groups of people in the way they behave

27  themselves that are bipolar schizophrenic.  Some of them become withdrawn and

28  submissive.  And some of them become belligerent and demand.  When somebody has a

47

brain disorder such as bipolar schizophrenia they are irrational.  That doesn't mean they
are unintelligent.  That means they're irrational.  Matthew Ramos was putting a lot of
pressure on his parents, specifically his mother, because he understood that that money
belonged to him.  And by a lot of pressure I meant, I mean, and I don't know that Mrs.
Ramos would ever admit to this, but very belligerent verbal abuse that I think would
escalate to the verge of physical violence.  At the time that Mrs. Ramos asked me several
times that she needed to give the money to Matthew Ramos, I thought at the time the state
proceeding would only take two or three more months and that would be all taken care of.
And I made a stupid and dumb decision.  I thought two or three months is worth about
$6,000, about $6,000 a month, I will reduce my attorneys fees and give them that money,
yeah, just to tide them over until the state proceedings are over.  What I didn't realize
was, when I told my bookkeeper, my office manager, to release the money, she took that
to mean that she could release all of it, which she did.  I'm not trying to use this as an
excuse, but I need to tell the court this.  My office manager has cancer, and she was off
work for six months.  She came back to work.  She went through chemotherapy, the
radiation therapy and that kind of thing.  And she's taking time off a lot since then to see
if she relapses, every once in a while she feels ill.  And she hasn't been hands-on as we
would both like her to be.  So I didn't find out that this total amount had been released
until sometime in September of 2005, or maybe August of 2005.  I had a heart attack
when I found that out.  I said, I told her not to release the monthly amounts anymore.  The
case had gotten away from me.  I hadn't kept tabs on it.  When the state proceedings were
finally over, I had Mrs. Ramos come in and we went over the amounts and it came out to,
I thought only $30,000 or $40,000, and I told Mrs. Ramos, and I tell the court this, I really
try to practice what I preach.  I try to practice, I preach about accountability.  I said I
screwed up, never mind that it wasn't for my benefit, I didn't see a penny of it, but I will
put all that money in, into the account, money that I should never have released, and
money that I should have kept tabs on.  Then later on, about two or three months ago, it
wasn't $30,000 or $40,000, it was a much higher amount.  I asked Mrs. Ramos, I told

Mrs. Ramos at that time, I said no matter what the amount, because I was stupid enough to make a decision, because I'd felt sorry for somebody and I thought I was helping them out, notwithstanding that, I should be accountable.  So I told her, I will pay, I will put in every penny that is due Matthew Ramos, never mind that he spent it on himself.  The court will notice, will note that on April 18, which was the date that the court ordered that all the monies be transferred from my trust account, the firm trust account, that amount was, approximately, I'll round it off to $438,000 . . .

**Court**: The amount on the accounting, exhibit B, that I've received that shows the checking accounts, it shows a deposit by D. Rodriguez, that's been blocked out, blacked out.  So there's no figure there.

**Attorney Rodriguez**: And I think it wasn't blacked out.  I think maybe a highlight, and then when they copied it . . .

**Court**: What's the amount then?

**Attorney Rodriguez**: The total amount . . .

**Court**: That you deposited.

**Attorney Rodriguez**: The total amount that I deposited is $438,125.32.

**Court**: Where did that money come from?

**Attorney Rodriguez**: From me.

**Court**: Are those your personal funds?

**Attorney Rodriguez**: Yes.

**Court**: Okay.

**Attorney Rodriguez**: And then the following day, Mrs. Ramos, what she did is she accumulated all the money she had from the different accounts that she had established.  And that came out to $135,534.89.  And she deposited it the following day.  The reason she didn't deposit it on April 18th, as she has explained to the court, she has a full-time job, she takes a lot of vacation time to manage the affairs of Matthew Ramos, taking him to doctors appointments and that kind of thing, and she found out that the banks close at three.  And she would jeopardize her job if she went.  But she did her best.  And I was

49

1  very keenly aware that the court's order said that by April 18th, all of the monies that

2  Matthew Ramos had owing to him be deposited.  So I deposited every penny on that date,

3  April 18th.  The following day, Mrs. Ramos brought in, after she had gathered all the

4  amounts that she had of $135,534.80, and she deposited in the blocked accounts in San

5  Joaquin.  So, Matthew Ramos, I stand before the court and first of all I apologize to the

6  court for not complying with the court's order.  I thought at the beginning it was only

7  going to be three months or so.  It was going to amount to maybe $15,000.  I would gladly

8  reduce my attorneys fees and hand that money over as extra just because I thought it was

9  the right thing to do to help the family out.  I didn't realize that we had released the big

10  amount of money.  Notwithstanding that, I still think I am responsible and accountable for

11  the full amount.  And that's why I deposited the full amount in the bank pursuant to the

12  court's order.  It certainly wasn't meant as an intentional non-compliance with the court's

13  order.  I didn't benefit from it.  I wasn't getting a penny from it.  It was, I thought I was

14  helping the family out.  I've dealt with Matthew Ramos.  He is an adult.  He is adult

15  sized.  He is, I'm representing him on criminal matters where he acts irrational.  Some of

16  them in which the victims are Mr. and Mrs. Ramos, his own parents.  Mrs. Ramos will

17  never admit that Matthew Ramos intimidates her to some degree.  She will never, as a

18  mother, she will never admit to that.  She hasn't benefitted from this.  She didn't spend a

19  penny on herself.  And I recognize when I say something like that that we don't have

20  every penny accounted for, but I stand here ready and able and willing to pay to make

21  Matthew Ramos whole, notwithstanding that all this money has already been spent for his

22  benefit.  Because I messed up.  I released money that I should never have released.

23  **Court**: How are checks written from your attorney-client trust account?  Who has to sign

24  them?

25  **Attorney Rodriguez**: There are about four people in the firm.  Myself, the office

26  manager, and at least two other people, if not three.

27  **Court**: So the check that was, or the money that was paid on July 30, 2004, the

28  $317,246.42, was that paid in one check?

1   **Attorney Rodriguez**: I don't know.

2   **Court**: Did you sign on that check?

3   **Attorney Rodriguez**: I don't know.

4   **Court**: Are you supposed to have signed on that check?

5   **Attorney Rodriguez**: No, it could have been one of four or five people.

6   **Court**: Does it just take one signature or more than one?

7   **Attorney Rodriguez**: One signature.

8   **Court**: And when do you say that you learned that the whole thing was paid, the whole

9   amount, rather than a few months worth?

10   **Attorney Rodriguez**: Probably in December of 2005, January of 2006, I think

11   somewhere along there.

12   **Court**: Here's another question that I have from looking at the transcripts of the hearings

13   that we've had on this, and looking at the pleadings that have been filed and the history of

14   case and the various orders.  You were told on May 24, 2004, that if you needed to come

15   into court you could come in on an ex parte basis once the conservatorship was

16   established to ask that the money be transferred from your trust account into the

17   conservatorship.  Do you remember that?

18   **Attorney Rodriguez**: I don't remember, but there's no doubt that it's in the transcript.

19   **Court**: The money was transferred on July 30, 2004, yet on August 4, 2004, after the

20   money was transferred, you wrote me a letter including an ex parte request to transfer the

21   money from your trust account into a conservatorship account.  That's when the

22   temporary conservatorship was established.  Why did you ask me to authorize the transfer

23   of the money without telling me that the money had already been transferred?

24   **Attorney Rodriguez**: I don't remember.  I mean I don't even remember writing that

25   letter.

26   **Court**: Do you agree that it looks bad?

27   **Attorney Rodriguez**: Of course.

28   **Court**: From my perspective?

1    **Attorney Rodriguez**: Of course.

2    **Court**: It looks like someone was hiding something from the court, the fact that the

3    money had already been transferred.

4    **Attorney Rodriguez**: Yes.

5    **Court**: Any comments on that?  I want to give you an opportunity to tell me your

6    complete side of the story.

7    **Attorney Rodriguez**: Well, I would like to think that it's obvious to the court, it simply,

8    it wasn't obviously for my benefit, it wasn't like I was going to keep a penny, or that I'd

9    keep a penny.  All that money was turned over to Mrs. Ramos.  So it wasn't written for

10   the purpose of me personally benefitting from it.

11   **Court**: That's one issue, is the payment of the money, the entire amount contrary to the

12   court's order.  That's one issue.  The other issue is the post-request to authorize a transfer

13   after the transfer had actually been made.  The second issue that I have, that I have a

14   difficult time understanding is, it appears from the record before the court that on a

15   monthly basis from July 30th of 2004 through at least September of 2005, that all of the

16   annuity payments were also transferred to Ms. Ramos in violation of the court's order.

17   Can you explain that?

18   **Attorney Rodriguez**: I was trying to rationalize my behavior.  By that I mean it was

19   small amounts released, relatively speaking.  Again, I didn't realize the big amount of

20   money had already been released.  I thought they needed the monthly money to meet all

21   of Matthew's necessities as well as demands because I know, I've dealt with him, he's

22   not the easiest person to deal with.  He's certainly not rational most of the time when I

23   deal with him.  And I've seen him, I've seen how he conducted himself around Mrs.

24   Ramos on several occasions, and I know that Mrs. Ramos was being stressed out because

25   of that.  So I thought that it would be helpful to the family to do that.

26   **Court**: But if $317,000 plus dollars had already been transferred, why did you think they

27   needed an extra $5,000 a month?

28   **Attorney Rodriguez**: I didn't realize that we had released the big amount.

52

**Court**: Did you take any steps to get the money back, and returned to your attorney-client trust account?

**Attorney Rodriguez**: When I met with Mrs. Ramos, and we're trying to figure out how much it was, I told her any amount that's missing, I will put in. Do you have any receipts, not receipts, do you have any amounts from the accounts? If so please tell me how much it is. I will figure out the difference. We will put all of it in the trust account. I will make up every penny that should be in there.

**Court**: One of the decisions that I have to make is to decide what should happen to the money. Whether I should continue to order it to be kept in the court-blocked accounts, in which case in order for your clients to get the money out of the account they would have to apply to the court on an interim basis as needed to have the money approved to be withdrawn from the blocked accounts. That's one of the issues that I have to decide. Another issue that I have to decide, beyond the issues of contempt, the next issue I have to decide is whether I should authorize the money to be released to the conservatorship account. Tell me why it's not appropriate under the circumstances, given what you've told me about what's happened with the money and given what your client said under oath about how she gave Matthew Ramos direct access to over $200,000 and what he chose to spend it on, why you think, if you think, that I should make any other order other than ordering that the money stay in the blocked accounts, in the federal court blocked accounts.

**Attorney Rodriguez**: First of all, because it will work a financial hardship on Mr. and Mrs. Ramos. They are already working very hard to deal with an adult son who has a brain disorder. To do this would impose a very dire financial hardship on the family, on Mr. and Mrs. Ramos. Secondly, let me share this story with the court. My parents are in their seventies. My dad is 76. My mom is 73. They own a home and two rentals, or they used to own two rentals. They sold the rentals. Before they sold the rentals, from time to time on a pretty regular basis they would come and ask me, I paid for their health insurance, I paid for their vehicles and so forth, and they still needed money. They finally

decided to sell their rentals.  Probably made something on the order of $150,000 on it.
Since then they haven't asked me, come and ask me for any money.  But what I do know
is that go to the casinos, Indian casinos, three, four, five times a week.  And at first I was
very alarmed that this hard-earned money that they spent a lifetime accumulating, they are
just throwing away.  And I talked to them.  And my parents said to me, number one they
said, you're our son, not our father.  Number two, it's not for drugs, it's not for any other
bad thing.  Sure, it could be fiscally better managed.  But we enjoy ourselves, we like
going there.  What is your idea of how we should spend the money?  That we go on
cruises?  That we do this, that we do that?  We go to museums?  We go to Yosemite?
That's not our idea of having fun.  Our idea of having fun is where most of our senior
citizen friends are, at the casinos.  So we are spending the money not in the way that you
think we should, but we're enjoying ourselves.  So, what is wrong with what we're
doing?  And after they told me that, I said yeah, my idea of fun is different than theirs.  I
only use that analogy for the court to illustrate the fact that Matthew Ramos has not spent
that money on drugs or anything . . .

**Court**: But how do I know that?  There's over $60,000 that aren't accounted for.

**Attorney Rodriguez**: And I realize the only answer I can give to the court is because
we're advising the court of that.

**Court**: How does your client know that if she doesn't keep track of what he spends the
money on?

**Attorney Rodriguez**: Matthew is not the kind of person that, he resents having Mrs.
Ramos, in his mind, most of the time he thinks he's an adult, and this is his money, Mrs.
Ramos has no business telling him how he should spend his money or where or when or
anything like that.  He is very demanding.  It's going to be impossible for Mrs. Ramos or
any other conservator to make him provide them with an accounting of every penny.  It's
not going to happen.  He's not a rational person.  Nor is he somebody whose brain
damaged that is, can barely speak and so forth that is easily controllable.  Matthew Ramos
is not easily controllable.  He is very difficult to deal with.  Nobody in his right mind

54

other than his mother would ever volunteer to deal and provide with Matthew every day of the week.  I mean, that's never going to happen.  No one is going to make Matthew Ramos account for every penny.  In his mind, it's his money, what business do you, Mrs. Ramos or anyone else have telling him how he spends his money.  And the only thing I can offer to the court is there's no evidence that he has spent it on drugs or anything else.  And I recognize that Mrs. Ramos is not with him 24 hours a day, but she would be in the best position to know whether or not he has spent it on such illegal things or bad things such as that.  She's the best source of information regarding him.

**Court**: You said that you are representing him on some criminal matters.  How many criminal matters?

**Attorney Rodriguez**: Three.

**Court**: And what is he charged with?

**Attorney Rodriguez**: One of them, public intoxication at the home.  He came home.  He'd been drinking.  The police came out and arrested him.  Public intoxication.  The next charge involves assault and battery on his dad.  Matthew is not rational.  Father came home, found that all of his stuff, he had tools and so forth from the garage, had been thrown out by Matthew out into the yard and Matthew had installed weight-lifting equipment in there.  One thing led to another, it escalated and allegedly Matthew battered Mr. Ramos.  The third incident involves, Matthew Ramos was at a billiard place, public billiard place, and he got into an argument with people there and he broke stuff inside the billiards place.  The police were called.  He ran outside.  The police arrived.  They approached him.  He wouldn't comply with their orders.  He got in a combative stance and he was arrested.

**Court**: Had he been drinking?

**Attorney Rodriguez**: Yes.

**Court**: Does he have a substance abuse problem?

**Attorney Rodriguez**: By substance abuse, does the court include alcohol, or does it refer to other things other than alcohol?

1   **Court**: Drugs or alcohol?

2   **Attorney Rodriguez**: Alcohol.  May I say this?

3   **Court**: Yes.

4   **Attorney Rodriguez**: From my perspective, as an almost very light drinker, as far I'm

5   concerned he does have, he drinks excessively.  From my perspective.

6   **Court**: Given that he has these problems, and given the reason why the conservatorship,

7   or your client was appointed as guardian ad litem in the first place, and why she was

8   appointed as conservator, do you think it was responsible or smart of her to give him

9   direct access to $200,000 in two bank accounts?

10   **Attorney Rodriguez**: I don't know if smart.  I think it was appropriate given the

11   circumstances.  Again, he has not spent it on, he has spent it on things he enjoys, none of

12   which we know to be illegal.  Weight lifting equipment, music.  He has these grandiose

13   ideas.  He does not think that he is an adult with disabilities.  He does not think of himself

14   that way.  He talks in tangents.  One moment he is talking about investing in the stock

15   market and making a million dollars.  The next moment he's talking about learning to

16   play the guitar and going out and buying musical equipment to do that.  The next thing he

17   wants to go and work out and become a body builder and sculpt his body.  It just runs the

18   gamut.  As a parent, as a conservator, what do you do?  What are the alternatives?  Call

19   the police and have him locked up?  And by the way he was locked up on at least one of

20   these occasions.  And what happened while he was there is this.  He wasn't taking his

21   medication.  By the way, most brain disordered people who suffer from bipolar

22   conditions, they don't like taking medication.  They don't like the way it makes them feel.

23   So they stop taking it.  It's a vicious cycle because when they stop taking then they

24   deteriorate and then they engage in misconduct.  Police are called.  They get arrested.

25   They get taken to the jail.  At the jail the law prevents, without a lengthy court

26   proceeding, any administration, involuntary administration of medication.  During those

27   45 to 60 days that it takes for these proceedings to take place, he is held in a cell by

28   himself.  He is naked, rubbing feces on himself and deteriorating and being stayed away

56

from the medication.  So as a parent what do you do?  Do you call the police and see your son deteriorate and possibly die as a result of that?  Or when he comes to you and he says "mom, I resent, I don't like the idea of you telling me what I can spend and can't spend, as long as I, so what if I go to Las Vegas, so what if I buy a $1,500 guitar, that's what I want to do."  If you say "no," and it escalates and then he becomes belligerent, as a mom how would you feel, not the court, but how would a person feel who is a mother by calling the police knowing full well that what would probably happen is that your son's psychiatric condition, psychotic condition, would deteriorate maybe to the point of dying or getting to the point where he'll never return even with medication.

**Court**: Perhaps your client isn't strong enough, and doesn't have the necessary strength of conviction, to act properly as a conservator for her son.  Have you considered that?

**Attorney Rodriguez**: Yes.  And I ask the question rhetorically, what is properly?  So far, Matthew, no one is going to make him take his medication.  Yes, he had been involved in criminal conduct.  That doesn't necessarily mean that the conservator acted inappropriately.

**Court**: It sounds like your client is intimidated by him.

**Attorney Rodriguez**: To a degree I would agree.

**Court**: And someone who is intimidated by a conservatee should not be the conservator.

**Attorney Rodriguez**: What would be the alternative?

**Court**: To appoint a third-party as a conservator.

**Attorney Rodriguez**: And what would that third-party conservator do, say no?

**Court**: Be objective in deciding where and how and when Matthew's money is spent.

**Attorney Rodriguez**: And I thought this through by the way.  I thought, that third-party conservator would say things, no you're not going to spend money on a $1,500 guitar, no you're not going to spend on a lavish gift of $500 or $1,000 for your brother's wedding, no you're not going to go to Las Vegas.  What is Matthew going to do with his money then?  Is he going to stay home 24 hours a day and not go out anywhere?

**Court**: And what happens to Matthew when he runs through his money and he has

57

1    nothing left.

2    **Attorney Rodriguez**: He gets an annuity every month.  So it's, if I remember correctly

3    it's guaranteed, it's for life guaranteed for 20 years.  What that means is if he passes

4    away, dies, then for 20 years it goes to his estate.  If he lives beyond the 20 he continues

5    getting that monthly stipend.

6    **Court**: So is it your client's understanding that her job as a conservator, and/or her job as

7    guardian ad litem, is to green light everything that Matthew wants to do?

8    **Attorney Rodriguez**: No.

9    **Court**: Where does she draw the line?

10   **Attorney Rodriguez**: I don't know exactly but I do know that she does.  She tries . . .

11   **Court**: What evidence is there of that with what's before the court?  It looks to me like

12   she gave him free access to over $250,000 to spend as he will, even though a

13   conservatorship was established.  That runs contrary to the tenets of a responsible

14   conservator.  I have never seen a conservator act in the fashion that your client has, by

15   giving the conservatee, the person who cannot take care of his own finances, which is part

16   of the reason why there's a conservatorship established in the first place, by giving him

17   free reign to spend the money as he wishes.  That's irresponsible behavior by a

18   conservator whichever way you slice it.  So my question, and I'm the one that asks the

19   questions here.  I understand you're asking rhetorical questions and I've allowed you to

20   be rhetorical in that regard.  But my question to you is, how can I have any sense of

21   security or trust that your client is going to operate responsibly as a conservator if I allow

22   this money to be transferred into the conservatorship account?  Based on what I've seen,

23   she has a very dismal track record.  I'm trying to keep my mind open.  Tell me what

24   evidence there is that she's being responsible.  That's she's not just giving in to his

25   demands and intimidation.

26   **Attorney Rodriguez**: May I go back to a point that the court made in its latest

27   comments?

28   **Court**: Yes.

**Attorney Rodriguez**: The court said "fiscally responsible."  What happens if Matthew runs through his money and Mrs. Ramos had done a dismal job?  If we look at the track record, he's not out on the street, he has plenty to eat, in fact he is overweight, she takes him to all of his medical appointments.  What good would it do to have all of this money in bank account?  How can we say it's not fiscally responsible if all of his needs have been met?  He's got room, a place to stay, he's got food to eat, entertainment, he's got all the basics and more that a fiscally responsible management of his funds would be.  The alternative would be not spend, spend a minimal amount, parcel out whatever somebody might think would be necessary. $2,000, $3,000 a month.  And he's not enjoying himself.  Or, let him spend, so long as it's not drugs or contraband or anything illegal, and he doesn't have $400,000, but he's got $150,000, but he's eating, breathing and living about as close as you can get given his condition to an independent lifestyle.  Between the two, which is the more desirable for Matthew Ramos?

**Court**: How much money do you think Matthew Ramos would have left in these accounts if all of this had not come to light?

**Attorney Rodriguez**: Between $150,000 and $200,000.  That's an educated guess.

**Court**: At the rate that the money has been spent since May of 2004 you think he'd have that much left if the court hadn't done what it had done?

**Attorney Rodriguez**: Yes, he has, Mrs. Ramos brought in and deposited approximately $135,000.  All of his needs have been met.  Health insurance has been paid for.  Auto insurance has been paid for.  He's got transportation.  He's got food.  He's got a place to stay.  Is he supposed to hoard his money?  Is Mrs. Ramos supposed to hoard his money for him?  What is the purpose of the money?  And because it is an annuity, and it's being paid out on a monthly basis, he's not going to go through it.  He's going to have approximately $6,000 a month at the minimum coming in to him for the rest of his life.  So my thinking isn't necessarily that Mrs. Ramos has done a terrible job.  I don't think anybody can do a better job given the circumstances.  If by doing a better job means getting some stern conservator who says "no, no, no, no" to most everything and parcels

out whatever, $2,000 or $3,000 a month, what that means is when Matthew Ramos dies his accounts will be very, very high, but did he have the quality of life and the choices that, if not always rational in fact rational not to make, but nonetheless enjoyed his life as he best could.

**Court**: Do you have anything else that you want to bring to my attention about your role in these proceedings?

**Attorney Rodriguez**: Your honor, as I mentioned before, I put in all the money because I realize that ultimately, regardless of my intentions, regardless of whether there was a windfall to the client or not, to the client Matthew Ramos or not, I made a stupid decision. I made a horrible decision. It's no excuse that I lost track of the case. It was settled and I didn't pay attention to the amounts of monies that were being spent. That doesn't justify my failings in not complying with the court's order. I would only point out to the court, again, that it wasn't like I was going to profit from it or anything like that. And as soon as I found out the amount, I mean, it was always my intention, I thought it would be a small amount that I would pay into it, and that would relieve some of this financial stress on the family and more importantly the stress of dealing with Matthew Ramos on a day to day basis by his mother. So, I stand before the court and I expect to be held accountable for my bad choices.

**Court**: How?

**Attorney Rodriguez**: The amount that Matthew, taking into account the last check that was deposited . . .

**Court**: You're talking about the one that was marked today?

**Attorney Rodriguez**: Yes your honor.

**Court**: And are you moving plaintiff's exhibit 1 into evidence?

**Court**: 1 is admitted.

**Attorney Rodriguez**: The total amount that Matthew Ramos should have in his account, if everything had been deposited and not a penny disbursed, would be $433,908.72. We know that there's more money in the accounts than that, by the amount of $135,534.89.

60

That's the amount that Mrs. Ramos deposited after I had deposited the full amount on April 18th.  So, if the court would order, would consider ordering that amount of $135,534.89 to be released to me, that would still leave Matthew Ramos with every penny in his account in addition to all the money that was spent by himself or on his behalf.  So he would have a windfall, I haven't done the math, but roughly $300,000.  So in effect, instead of having gotten a settlement that would have generated an amount of $440,000 approximately, that means he would have gotten $740,000.

**Court**: And are you going to ask for reimbursement of that from the conservatorship account in the state court proceedings?

**Attorney Rodriguez**: I'm not familiar with how probate court works.  For example . . .

**Court**: Are you going to file a claim in the conservatorship to get back the money that you put in to make him whole in these proceedings?

**Attorney Rodriguez**: I don't think so because procedurally, I think these accounts were, I don't think I know, these accounts were established pursuant to this court's orders, not the state court's orders.  These accounts that we're talking about.  So, I don't think the state court would have jurisdiction over this amount.  If this court were to consider ordering that the $443,908.72 be transferred to the state conservatorship accounts, and ordering that from these accounts established pursuant to federal order that roughly $135,000 be returned to me, that means that Matthew would have all this money in the state conservatorship account.

**Court**: And according to the conservatorship orders in that case, your client has authority over the first $310,000, with anything over that going into a court blocked account.  That means that would give your client direct access to $310,000.  This is the same client that gave the conservatee direct access to $200,000.  Do you think that's a smart thing to do given the track record?

**Attorney Rodriguez**: Yes your honor.  I think the court and myself have different perspectives.  I keep harking back to what's the purpose . . .

**Court**: She's already violated her duties as a conservator in the Kern County Superior

61

1   Court.  And it wouldn't surprise me if the Kern County Superior Court, upon learning of

2   what she has done, would terminate her as a conservator and seek to be reimbursed for

3   what she did, for any losses that the estate suffered.  The first thing that she should have

4   done as a conservator is establish conservatorship accounts in the name of the

5   conservatorship.  It is unbelievable to me.  Well, I believe it now because I heard it from

6   her own words under oath today, that she would do what she had done, creating two

7   accounts in her name and her son's name and giving him access to that.  That's about the

8   worst thing you can do as a conservator.  And for her to sit there and tell me that she

9   didn't know that she couldn't do that, I find that incredible testimony.  A conservator has

10  to sign documents saying that they know what their duties are as a conservator, and I find

11  it difficult to believe what she said.  And partly because of that, and because of her

12  demeanor on the stand today, she doesn't have much credibility with me, as the court

13  today, sitting here listening to her testimony.  So I'm really trying hard to find a way to

14  preserve Matthew's assets so that they don't get further dissipated by a conservator who

15  apparently thinks that the conservatee is the one gets to decide how the money is spent.  A

16  conservatee who has a substance abuse problem, who has an anger management problem,

17  and who by everyone's account is irrational and suffers from bipolar disease.  There are

18  reasons why there is a conservatorship established, and there are reasons why a guardian

19  ad litem was appointed, and what I'm being asked to do is to ignore all of those reasons

20  and pretend that what she did was right.  And it wasn't.  I'm trying very hard to come up

21  with a solution to this dilemma that's been created because the court's orders weren't

22  followed in the first place.  A mess was created and I'm trying to figure out how to

23  resolve the mess.  Right now the only way that I can think of to resolve it is to order that

24  the money stay in the blocked accounts.  It's not something that I necessarily want to do

25  because I'd like to see a conservatorship court be the one to administer the funds.  But it

26  looks like Ms. Ramos isn't the appropriate person to be a conservator because she can't

27  be responsible because she is intimidated by her son and she lets him do what he wants.

28  It's not an easy situation.  And I'm trying to come to a fair, equitable and proper solution.

62

1  And we wouldn't be in this spot if the court's orders had been followed in the first place,
2  which is part of the reason why we're here today.  But the other part of the reason why
3  we're here today is for me to decide what is the best thing to do.  So that is something that
4  I will be thinking about.  I'm going to take this under submission and then I'll issue a
5  ruling.  But before I take it under submission, I want to give you one last chance to give
6  me any other comments or thoughts that you think I should know before I make my
7  ruling.
8  **Attorney Rodriguez**: Your honor, the court commented that if Mrs. Ramos, if this
9  account were to be sent back to state court, that she would be sanctioned for the estate
10  having less.  What I'm proposing to the court is the estate won't have a penny less than if
11  none of this had happened, none of this mess had occurred, and the court ordered that
12  $443,908.72 be placed, that's, the estate has not suffered.
13  **Court**: But here's my point.  If she's got free access to the first $310,000, which she does
14  under the way the conservatorship order is in place, how do I know she's not going to do
15  the same with that money that she did with this money?  The only reason that the estate is
16  "whole," so to speak is because you stepped and put in your own money to make it whole.
17  If you hadn't done that this estate would be in a whole lot of trouble.
18  **Attorney Rodriguez**: And the reason I stepped up was because I created the problem.  I
19  made decisions based on feeling sorry for people as opposed to thinking with my head.
20  Your honor, I would ask the court to consider only transferring the amount that would
21  make Matthew Ramos whole, which is $443,908.72.  That takes into account the latest
22  check.  And the $135,534.89 which is in excess of the made whole sum, that the court
23  allow me to take that back because what that means is, let me back up, I think the court's
24  aware that there is $579,444.01 in the account.  The only reason that happened is because
25  on April 18, in order to comply with the court, I deposited the full amount because Mrs.
26  Ramos wasn't able to get all the monies that she had from the various accounts.  So what
27  is now in the account exceeds the amount that should be in there to make Matthew
28  Ramos whole by the exact amount that Mrs. Ramos deposited.  So I would only ask that

63

the court . . .

**Court**: So you paid more money than you would have if you had known that didn't deposit the $135,534.89.  Right?

**Attorney Rodriguez**: No, I knew she was going to . . .

**Court**: But if she had, if she had deposited on the day she was supposed to, you would have deposited . . ..

**Attorney Rodriguez**: The balance . . .

**Court**: $135,543.89 less, correct?

**Attorney Rodriguez**: That's correct.

**Court**: So, she got, there's that much more money in there than there should have been?

**Attorney Rodriguez**: Right.

**Court**: So you are asking me to order that you get reimbursed that amount, rather than the estate?

**Attorney Rodriguez**: Right.

**Court**: Tell me why I should?

**Attorney Rodriguez**: Because if the purpose of this proceeding is to make sure that Matthew Ramos was not harmed, and that all the monies that he was entitled to, notwithstanding the fact that he spent it or it was spent on his behalf, we've done that with the $438,125.32.  If that is the purpose of this proceedings.  I don't believe the purpose of this proceeding is to give him a bigger windfall than he's already going to get. When I say he I mean the conservatorship.  I don't think that's the purpose of this proceeding, or at least not one of the purposes of this proceeding.  So I'm hoping I responded to the court's question

**Court**: Thank you.  Anything else Mr. Rodgriguez?

**Attorney Rodriguez**: No your honor, thank you.

**Court**: This matter is under submission.  All existing orders remain in effect pending further of the court.  Thank you.

END